# ZICARELLI *v.* NEW JERSEY STATE COMMISSION OF INVESTIGATION

No. 69–4.   Argued January 11, 1972—Decided May 22, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and BLACKMUN, JJ., joined. DOUGLAS, J., *post,* p. 481, and MARSHALL, J., *post,* p. 481, filed dissenting statements. BRENNAN and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Michael A. Querques* argued the cause for appellant. With him on the brief were *Daniel E. Isles, Harvey Weissbard,* and *Joseph E. Brill.*

*Andrew F. Phelan* argued the cause and filed a brief for appellee.

*George F. Kugler, Jr.,* Attorney General, argued the cause for the State of New Jersey as *amicus curiae* urging affirmance. With him on the brief were *Barry H. Evenchick* and *Michael R. Perle,* Deputy Attorneys General.

*Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

*Robert G. Dixon, Jr.,* filed a brief for the National District Attorneys Association et al. as *amici curiae* urging affirmance.

MR. JUSTICE POWELL delivered the opinion of the Court.

This case, like *Kastigar* v. *United States, ante,* p. 441, raises questions concerning the conditions under which testimony can be compelled from an unwilling witness who invokes the Fifth Amendment privilege against compulsory self-incrimination.

The New Jersey State Commission of Investigation [1] subpoenaed appellant to appear on July 8, 1969, to testify concerning organized crime, racketeering, and

---

[1] The New Jersey Legislature created the Commission primarily to investigate organized crime, racketeering, and political corruption in New Jersey. N. J. Rev. Stat. §§ 52:9M–1 and 52:9M–2 (1970 and Supp. 1971–1972).

political corruption in Long Branch, New Jersey.[2]   In
the course of several appearances before the Commis-
sion, he invoked his privilege against self-incrimina-
tion and refused to answer a series of 100 questions.  The
Commission granted him immunity pursuant to N. J.
Rev. Stat. § 52:9M–17 (a) (1970), and ordered him
to answer the questions.   Notwithstanding the grant
of immunity, he persisted in his refusal to answer.   The
Commission then petitioned the Superior Court of
Mercer County for an order directing appellant to show
cause why he should not be adjudged in contempt of
the Commission and committed to jail until such time
as he purged himself of contempt by testifying as
ordered.   At the hearing on the order to show cause,
appellant challenged the order to testify on several
grounds, one of which was that the statutory immunity
was insufficient in several respects to compel testimony
over a claim of the privilege.   The Superior Court re-
jected this contention, and ordered appellant incarcerated
until such time as he testified as ordered.   The Supreme
Court of New Jersey certified appellant's appeal before
argument in the Appellate Division, and affirmed the
judgment of the Superior Court.   *In re Zicarelli*, 55
N. J. 249, 261 A. 2d 129 (1970).   This Court noted
probable jurisdiction and set the case for argument to
consider appellant's challenges to the sufficiency of the
immunity authorized by the statute.   401 U. S. 933
(1971.)

I

A majority of the members of the Commission have
authority to confer immunity on a witness who invokes

---

[2] The New Jersey Code of Fair Procedure requires that persons
summoned to testify before the Commission be served prior to the
time they are required to appear with a statement of the subject
of the investigation.   N. J. Rev. Stat. § 52:13E–2 (1970).   The
subpoena served on appellant contained this statement.   App. 3a.

the privilege against self-incrimination.[3]   After the witness testifies under the grant of immunity, the statute provides that:

> "he shall be immune from having such responsive answer given by him or such responsive evidence produced by him, or evidence derived therefrom used to expose him to criminal prosecution or penalty or to a forfeiture of his estate, except that such person may nevertheless be prosecuted for any perjury committed in such answer or in producing such evidence, or for contempt for failing to give an answer or produce evidence in accordance with the order of the commission . . . ." N. J. Rev. Stat. § 52:9M–17 (b) (1970).

This is a comprehensive prohibition on the use and derivative use of testimony compelled under a grant of immunity.[4]   Appellant contends that only full transactional immunity affords protection commensurate with that afforded by the privilege and suffices to compel testimony over a claim of the privilege.  We rejected this argument today in *Kastigar,* where we held that immunity from use and derivative use is coextensive with the scope of the privilege, and is therefore sufficient to compel testimony.  We perceive no difference between the degree of protection afforded by the New Jersey statute and that afforded by the federal statute sustained in *Kastigar.*

Appellant also contends that while immunity from use and derivative use may suffice to secure the protection of the privilege from invasion by jurisdictions other than the jurisdiction seeking to compel testimony, that jurisdiction must grant the greater protection afforded by transactional immunity.  In *Kastigar,* we held that

---

[3] N. J. Rev. Stat. § 52:9M–17 (a) (1970).

[4] See *In re Zicarelli,* 55 N. J. 249, 270, 261 A. 2d 129, 140 (1970).

immunity from use and derivative use is commensurate with the protection afforded by the privilege, and rejected the notion that in our federal system a jurisdiction seeking to compel testimony must grant protection greater than that afforded by the privilege in order to supplant the privilege and compel testimony. Our holding in *Kastigar* is controlling here.

## II

Appellant contends that the immunity provided by the New Jersey statute is unconstitutionally vague because it immunizes a witness only against the use and derivative use of "responsive" answers and evidence, without providing statutory guidelines for determining what is a "responsive" answer. The statute does not come to us devoid of interpretation, for the Supreme Court of New Jersey construed the responsiveness limitation as follows:

> "The limitation is intended to prevent a witness from seeking undue protection by volunteering what the State already knows or will likely come upon without the witness's aid. The purpose is not to trap. Fairly construed, the statute protects the witness against answers and evidence he in good faith believed were demanded." 55 N. J., at 270–271, 261 A. 2d, at 140.

This is not the technical construction of "responsive" in the legal evidentiary sense that appellant fears,[5] but, rather, is a construction cast in terms of ordinary English usage[6] and the good-faith understanding of the average man. The term "responsive" in ordinary English usage has a well-recognized meaning. It is not,

---

[5] See 3 J. Wigmore, Evidence § 785, pp. 200–202 (J. Chadbourn rev. 1970).

[6] Cf. *Malloy* v. *Hogan*, 378 U. S. 1, 12 (1964); *Hoffman* v. *United States*, 341 U. S. 479, 487 (1951).

as appellant argues, "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally* v. *General Construction Co.,* 269 U. S. 385, 391 (1926).

Moreover, the contention that ambiguity in the term "responsive" poses undue hazards for a witness testifying under a grant of immunity must be considered in the context in which the statute operates. This is not a penal statute that requires an uncounseled decision by a layman as to what course of action is lawful to pursue. A witness before the Commission is entitled to have in advance of his testimony a statement of the subject matter on which the Commission intends to examine him.[7] This advance notice of the subject of the inquiry will provide a background and context that will aid a witness in determining what information the questions seek. The New Jersey statute further provides that a witness before the Commission is entitled to have counsel present during the course of the hearing,[8] and counsel may secure clarification of vague or ambiguous questions in advance of a response by the witness.[9] The responsiveness limitation is not a trap for the unwary; rather it is a barrier to those who would intentionally tender information not sought in an effort to frustrate and prevent criminal prosecution.[10] The con-

---

[7] N. J. Rev. Stat. § 52:13E–2 (1970).

[8] N. J. Rev. Stat. § 52:13E–3 (1970).

[9] Appellant does not contend that counsel, although present, is so limited in his role that he cannot obtain clarification of any questions that the witness does not understand fully. Counsel for the Commission states that a witness may even object to questions on the ground that they are not relevant to the subject matter of the inquiry, and obtain a court ruling on relevancy before being required to answer. Appellee's Brief 81–82.

[10] *In re Zicarelli,* 55 N. J., at 270–271, 261 A. 2d, at 140. See generally Comment, The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope, 72 Yale L. J. 1568, 1572 (1963).

text in which the statute operates [11] reaffirms our conclusion that the responsiveness limitation does not violate the Due Process Clause of the Fourteenth Amendment.

## III

Appellant further asserts that he cannot be compelled to testify before the Commission because his testimony would expose him to danger of foreign prosecution. He argues that he has a real and substantial fear of foreign prosecution, and that he cannot be compelled to incriminate himself under foreign law. It follows, he insists, that he cannot be compelled to testify, irrespective of the scope of the immunity he receives, because neither the New Jersey statute nor the Fifth Amendment privilege can prevent either prosecution or use of his testimony by a foreign sovereign. This Court noted probable jurisdiction to consider appellant's claim that a grant of immunity cannot supplant the Fifth Amendment privilege with respect to an individual who has a real and substantial fear of foreign prosecution. We have concluded, however, that it is unnecessary to reach the constitutional question in this case.

It is well established that the privilege protects against real dangers, not remote and speculative possibilities.[12] At the hearing before the Superior Court of Mercer County, appellant introduced numerous newspaper and magazine articles bearing upon his self-incrimination claim. He called a number of these articles to the court's attention in an effort to demonstrate the basis of a fear

---

[11] Appellant refused to answer 100 questions. None of these questions is pointed to as an example of a question that is so vague that an ordinary man could not determine what information the question seeks.

[12] E. g., Mason v. United States, 244 U. S. 362 (1917); Heike v. United States, 227 U. S. 131, 144 (1913); Brown v. Walker, 161 U. S. 591, 599–600 (1896); Queen v. Boyes, 1 B. & S. 311, 329–331, 121 Eng. Rep. 730, 738 (Q. B. 1861).

of foreign prosecution.[13] These articles labeled appellant the "foremost internationalist" in organized crime,[14] and detailed his alleged participation in unlawful ventures growing out of alleged interests and activities in Canada[15] and the Dominican Republic.[16]

While these articles would lend support to a claim of fear of foreign prosecution in the abstract, they do not support such a claim in the context of the questions asked by the Commission. Of the 100 questions he refused to answer, appellant cites only one specific question[17] as posing a substantial risk of incrimination

[13] Cf. *Hoffman* v. *United States,* 341 U. S., at 489.

[14] Life, Sept. 8, 1967, p. 101.

[15] Life, Aug. 9, 1968, p. 24.

[16] Life, Sept. 8, 1967, p. 101. Appellant also alleges that these articles support his claim of a real and substantial danger of prosecution by Venezuela. The only reference to Venezuela, however, is a statement that appellant "has holdings in Venezuela." Life, Sept. 1, 1967, at 45.

[17] Appellant also raises a vague objection on grounds of incrimination under foreign law to these five questions:

"Q. Are you a member of any secret organization that is dedicated to or whose principle is to pursue crime and protect those of its members who do commit crime?" App. 8a.

"Q. Do you know that organization by the name Cosa Nostra?" App. 17a.

"Q. Are you a member of the organization known as Cosa Nostra?" App. 18a.

"Q. In whose family of Cosa Nostra are you a member?

"Q. Do you know Joseph Bonanno?" App. 20a.

These questions do not seek answers concerning foreign involvements or foreign criminal activity. Indeed, they do not relate to criminal acts. Nor is it even remotely likely that their answers could afford "a link in the chain of evidence" needed to prosecute appellant in a foreign jurisdiction. Cf. *Blau* v. *United States,* 340 U. S. 159, 161 (1950). For if appellant identified himself as a member of the Cosa Nostra in the "family" of Joseph Bonanno, he would only confirm an assumption widely held by law enforcement authorities. See, *e. g.,* S. Rep. No. 91–617, p. 38 (1969). To confirm the operating assumption of law enforcement authorities hardly provides a new "link" to evidence that could be used in a foreign prosecution.

under foreign law. That question is: "In what geographical area do you have Cosa Nostra responsibilities?"

We think it plain from the context in which the question was asked that it sought an answer concerning geographical areas in New Jersey. The subject of the hearing was law enforcement, organized crime, racketeering, and political corruption in the city of Long Branch, which is located in Monmouth County, New Jersey. Eleven of the 13 questions preceding the question under consideration related specifically to the city of Long Branch and Monmouth County.[18] Of course, neither the fact that the Commission was not seeking information concerning appellant's activities outside the United States, nor the fact that the question was not designed to elicit such information, is dispositive of appellant's claim that an answer to the question would incriminate him under foreign law. When considering whether a claim of the privilege should be sustained, the court focuses inquiry on what a truthful answer might disclose, rather than on what information is expected by the questioner.[19] But the context in which a question is asked imparts additional meaning to the question, and clarifies what information is sought. A question to which a claim of the privilege is interposed must be considered "in the setting in which it is asked." *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951).

Considering this question in light of the circumstances in which it was asked, we agree with the conclusion of the Supreme Court of New Jersey that appellant was never in real danger of being compelled to disclose information that might incriminate him under foreign law. Even if appellant has international Cosa Nostra responsibilities, he could have answered this question truth-

---

[18] The question under consideration was followed by the question: "Is Monmouth County within that geographical area?"

[19] See *Hoffman* v. *United States,* 341 U. S. 479 (1951).

fully without disclosing them. Should he have found it necessary to qualify his answer by confining it to domestic responsibilities in order to avoid incrimination under foreign law, he could have done so. To have divulged international responsibilities would have been to volunteer information not sought, and apparently not relevant to the Commission's investigation. We think that in the circumstances of the questioning this was clear to appellant and his counsel.

Appellant is of course free to purge himself of contempt by answering the Commission's questions. Should the Commission inquire into matters that might incriminate him under foreign law and pose a substantial risk of foreign prosecution, and should such inquiry be sustained over a relevancy objection,[20] then a constitutional question will be squarely presented. We do not believe that the record in this case presents such a question.

The judgment of the Supreme Court of New Jersey accordingly is

*Affirmed.*

MR. JUSTICE BRENNAN and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS dissents for the reasons stated in his dissenting opinion in *Kastigar* v. *United States, ante,* p. 462.

MR. JUSTICE MARSHALL dissents for the reasons stated in his dissenting opinion in *Kastigar* v. *United States, ante,* p. 467.

---

[20] See n. 9, *supra.*