**In re Karen CARDASSI.**

**Civ. A. No. 15346.**

United States District Court,
D. Connecticut.

Dec. 1, 1972.

B. Blair Crawford, Asst. U. S. Atty., Hartford, Conn., for petitioner.

David N. Rosen, New Haven, Conn., for respondent.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This is an application by the Government for an order to compel a grand jury witness to answer questions after the witness has been accorded use immunity pursuant to 18 U.S.C. § 6003. The issue is whether and in what circumstances a witness given use immunity by a federal court may invoke the self-incrimination privilege of the Fifth Amendment as a safeguard against foreign prosecution.

The witness appeared pursuant to subpoena before a session of the federal grand jury for the District of Connecticut at New Haven on September 25, 1972. She was asked the following four questions:

1. Where in the last fifteen months have you traveled with Harry Maiden?

2. On July 6, 1972 were you in an apartment in West Haven with Harry Maiden, Edward Andrew Shea, Clifford B. Warsaw, and Roland Febles?

3. On the evening of July 6, I believe it was, in the apartment in question a large amount of marijuana was found and a large amount of marijuana was recovered in another apartment. Would you tell us please, if you know, where the marijuana came from?

4. Have you traveled overseas with Harry Maiden or in any foreign country?

The witness was permitted to consult with her attorney outside the grand jury room after each question, and responded to each question by invoking her privilege against self-incrimination. The Government immediately brought the witness before this Court to secure an immunity order. Following a brief hearing at which the witness, through counsel, presented certain procedural objections to the grant of immunity, this Court entered an order granting the witness use immunity.[1] The witness returned to the grand jury room and advised the grand jury that she would continue to refuse to answer the questions previously put to her, relying on her self-incrimination privilege. The Government then brought the witness back to this Court to seek an order compelling her to answer the questions.[2]

1. The witness had objected to the immunity order on the ground that the Government had failed to establish compliance with the internal administrative steps which the Department of Justice requires be followed by the United States Attorney applying for the immunity order. These steps are set forth in a letter from Attorney General Kleindienst to Chairman Celler of the House Judiciary Committee, dated November 30, 1971. Hearings on H.R. 2589, 8829, and 10689 Before Subcommittee No. 5 of the House Committee on the Judiciary, 92d Cong., 1st Sess. (Nov. 10, 1971) pp. 68–71. This Court rejected this challenge, believing that § 6003 sets forth the only procedural requirements that must be met before an immunity order may be entered. See In re Tierney, 465 F.2d 806, 813 (5th Cir. 1972). The Court had previously expressed to the Government some doubts as to whether an application for an immunity order could be acted upon before the witness has appeared and invoked her privilege, since this approach, though authorized by the statute, appeared to raise a substantial question of whether there existed a case or controversy within the meaning of Article III. The Government, however, declined to press the point and elected to seek the immunity order only after the witness had testified and invoked her privilege.

2. The immunity order entered at the witness's first court appearance not only granted her use immunity but also directed her to answer the grand jury's questions. However, in considering the Government's request for the immunity order, the Court dealt only with the Government's entitlement to grant the witness use immunity, not with the availability of the self-incrimination privilege to the witness, notwithstanding use immunity. The latter issue is now before the Court.

## I

The witness claims the right to invoke the self-incrimination privilege because of her fear that, despite domestic use immunity, her testimony may be used against her in a foreign prosecution. The Government first answers that such fears are unreasonable in light of the strict judicial controls against disclosure of grand jury minutes provided by Fed. R.Crim.P. 6(e).[3] Since the minutes cannot be disclosed without court approval, the argument runs, the court can insure that no disclosure of her answers will be permitted in circumstances where the answers might end up in the hands of foreign prosecuting authorities.

■ With deference, this Court declines to follow the two courts of appeals which have found this argument persuasive. In re Tierney, 465 F.2d 806, 811–812 (5th Cir. 1972); In re Parker, 411 F.2d 1067, 1069–1070 (10th Cir. 1969), vacated and remanded for dismissal as being moot, Parker v. United States, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970). The argument rests on the assumption that all law enforcement officials with access to grand jury minutes can be relied upon to abide by the disclosure requirements of Rule 6(e). While there is no reason to believe that any enforcement officials presently involved in this grand jury proceeding would not honor the rule, the constitutional protection of the witness must rest on more than faith. If in fact a law enforcement official wanted to make the witness's answers known to foreign prosecuting officials, it is unlikely that he would apply to this Court for disclosure of the grand jury minutes. He would simply send the transcript. It may well be that such conduct would render the official subject to the disciplinary powers of this Court if the conduct and the identity of the person responsible ever became known, but such an after-the-fact sanction would provide no protection for the witness.

■ The inability of American courts to use Rule 6(e) as an effective protection for this witness against foreign use of her compelled testimony is highlighted by comparison with the ability the courts do have to enforce within this country the derivative use prohibition of 18 U.S.C. § 6002. If a federal or state prosecuting official attempts to use evidence obtained directly or derivatively from a witness compelled to answer after receiving use immunity, the courts of this country have power to make sure that such evidence is excluded, or that any conviction thereby obtained is set aside. See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); see also Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). The prospect feared by the witness in such circumstances is within the ultimate control of federal and state trial courts, with direct and collateral review available culminating in the Supreme Court. Such control can be relied upon to provide "very substantial protection" against use of compelled testimony against a witness in domestic courts. Kastigar v. United States, supra, 406 U.

---

3. Rule 6. The Grand Jury
\* \* \* \* \*
(e) Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule. The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons.

S. at 461, 92 S.Ct. 1653; *but see id.* at 469 (dissenting opinion of Justice Marshall). The existence of this judicial control was what persuaded the Court in *Kastigar* that the self-incrimination privilege could be displaced by a grant of use immunity. "A person accorded this immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." *Id.* at 460, 92 S.Ct. 1653, 1665. Rule 6(e) provides no similar protection, yet it is the sole safeguard the Government can offer a witness who fears his compelled testimony may be used against him in foreign courts where the domestic judicial ban on use and derivative use of compelled testimony is unenforceable.

## II

Thus there must be faced in this proceeding the issue, specifically left open by the Supreme Court in Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), whether a use immunity statute displaces the self-incrimination privilege when the witness alleges fear of foreign prosecution. While the Court noted probable jurisdiction in *Zicarelli* to resolve this issue, 401 U.S. 933, 934, 91 S.Ct. 916, 28 L.Ed.2d 213 (1971), decision was deemed unnecessary because the questions there asked of the witness were not viewed by the Court as calling for answers that gave the witness a reasonable basis for fearing foreign prosecution. 406 U.S., at 478–481, 92 S.Ct. 1670.

The preliminary question here, therefore, is whether this witness had a reasonable basis for fearing foreign prosecution. Unfortunately, analysis of *Zicarelli* creates some doubt as to what test is to be applied in making this determination. The Court identified only one question that might have justified Zicarelli's fear of foreign prosecution:

"'In what geographical area do you have Cosa Nostra responsibilities?'" *Id.* at 480, 92 S.Ct. at 1676. The Court rejected the witness's concern on two grounds: first, that the context of the question showed it referred to geographical areas in New Jersey, and, second, that even if the witness had international Cosa Nostra responsibilities, he could have "qualif[ied] his answer by confining it to domestic responsibilities in order to avoid incrimination under foreign law." *Id.* at 481, 92 S.Ct. at 1676. This second approach might suggest that a question will be analyzed to determine whether the answer directly relates to foreign involvement, rather than whether it might provide "a link in the chain of evidence" needed for a foreign prosecution. *See* Blau v. United States, 340 U.S. 159, 161, 71 S.Ct. 223, 95 L.Ed. 170 (1950).

Primarily, however, the Court emphasized that the questions must be considered in the "context" or "setting" in which they are asked. 406 U.S. at 480, 92 S.Ct. 1670; Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). It was the context of the 100 questions asked Zicarelli that persuaded the Court that there was no reasonable fear of foreign prosecution. Moreover, in rejecting the significance of some of these questions, the Court explicitly used the "link in the chain" test of *Blau*. 406 U.S. at 479, n. 16, 92 S.Ct. 1670. Thus foreign prosecution can be reasonably apprehended if the context of the questions establishes that the answers they seek might be incriminating under foreign law.

The four questions asked here do not by themselves either completely establish or negate a context in which the answers might be incriminating under foreign law. But the questions were acknowledged by the prosecutor to be only a sample of what was to come.[4] Moreover, the prosecutor candidly stated that

---

4. "Your Honor, I should point out that the questions that were asked of the witness yesterday were really designed only to be representative questions, to simply

get the matter in before a hearing, and it was by no means all the questions we intend to ask her." Tr. 56–57.

at least one of the contexts of the questions he had asked and others he expected to ask concerned dealings in marijuana in Mexico. As he stated at the hearing on this motion, "[I]t is really what happened down in Mexico that we are primarily concerned about. . . . " Tr. 55. "Your Honor, I think what [defense counsel] is trying to establish is that what we have in mind here is an investigation into marijuana and other matters which involve Mexico. That is true. There is no question about it. If that is what he is hoping to establish, I am happy to say that on the record." Tr. 36. The context was further elaborated by the pendency of an indictment in this District charging Harry Maiden and others inquired about in question 2 with possession of 500 pounds of marijuana. Finally, the witness introduced a newspaper article describing the pending charges as being related to an investigation of marijuana smuggling from Mexico. While the prosecutor disputed some allegations of the article, there was no dispute that the incident being probed did concern marijuana smuggling from Mexico.

Against this context, questions 1, 3, and 4 plainly call for answers that might reasonably be feared to be incriminating under the laws of Mexico, which penalize exporting and trafficking in marijuana and aiding and abetting such activities.[5] Question 2, viewed in isolation, may relate to conduct that might violate United States and Connecticut laws, rather than the laws of Mexico, since the apartment asked about is located in West Haven, Connecticut. However, if the witness has a reasonable ba-

sis for fearing foreign prosecution for smuggling narcotics from Mexico to Connecticut, then even a disclosure concerning her presence at an apartment with those accused of smuggling narcotics can certainly provide a link in the chain of evidence needed for such a foreign prosecution.[6] In a different context, the witness might have no reasonable basis for fearing prosecution by responding to question 2. In this context, her fear is entirely reasonable.[7]

### III

The ultimate constitutional question is whether the self-incrimination privilege provides protection for the witness, despite use immunity, once it has been determined that her fear of foreign prosecution is reasonable. The question has not been answered in this Circuit, though the Tenth Circuit has, as an alternate holding, ruled against the claim. In re Parker, *supra.*

While *Zicarelli* did not answer the question, the Supreme Court's prior decision in *Murphy* provides sufficient guidance for a determination that the privilege can be invoked in these circumstances. The Court there rejected the two sovereignties rule of United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), pointed out the historical error underlying the *Murdock* rule, and concluded by accepting the construction of the privilege given by the English courts and by the early Supreme Court decisions of United States v. Saline Bank of Virginia, 1 Pet. 100, 7 L. Ed. 69 (1828), and Ballmann v. Fagin, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906). While *Saline Bank* and *Ballmann* were both concerned with a claim

5. Codigo Penal Mexicano, Arts. 195, 197 (1967 amendments).

6. As Cockburn, C. J., observed, in a passage frequently cited in Supreme Court decisions, the court must determine "from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is a reasonable ground to apprehend danger." But "if the fact of the witness being in danger be once made to appear, great latitude should be allowed to him in judging for himself of the effect of any

particular question." Queen v. Boyes, 1 B. & S. 311, 329–330, 121 Eng.Rep. 730, 738 (1861).

7. As additional basis for the witness's apprehension, her counsel points to a reference in the newspaper article to some interest in the case on the part of Mexican authorities. While the Government disputes the truthfulness of this reference, it nonetheless does provide additional basis, even if disputed, for the witness to fear foreign prosecution.

of the privilege in a federal proceeding to guard against state prosecution, *Murphy's* acceptance of the English rule, as stated in United States of America v. McRae, L.R., 3 Ch.App. 79 (1867), clearly makes the privilege a protection against foreign prosecution. The Court discussed at length the Court of Chancery Appeal decision in *McRae*, where the privilege was successfully claimed in an English court to guard against an American prosecution. *See, generally*, Grant, "Federalism and Self-Incrimination" 5 U.C.L.A. L.R. 1 (1958).

Nothing in *Zicarelli* impairs the *Murphy* rule that the privilege can be asserted in the forum of one sovereign to guard against prosecution in the courts of another sovereign. *Zicarelli* simply applies to this rule the traditional limitation that the fear of foreign prosecution must be "real" and not a "remote and speculative" possibility. 406 U.S. at 478, 92 S.Ct. 1670. That test is met in this case. *Zicarelli* does not appear to require any indication that a foreign prosecution is imminent.

The Government contends that *Murphy* should not be understood as adopting the English rule concerning the scope of the privilege because of earlier cases which they cite for the proposition that the Bill of Rights does not provide an American citizen with any protection against the actions of foreign governments. They rely on such cases as Neely v. Henkel, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901), and Gallina v. Fraser, 177 F.Supp. 856 (D.Conn.1959), aff'd, 278 F.2d 77 (2d Cir. 1960), cert. denied, 364 U.S. 851, 81 S.Ct. 97, 5 L. Ed.2d 74 (1960). These are extradition cases. They raise the issue of whether a federal court, in the exercise of its habeas corpus jurisdiction, may interfere with a decision of the Executive Branch to remit a citizen to a foreign government on the grounds that a protection of

the Bill of Rights will not be available to the citizen in the foreign prosecution. The cases are unanimous that American courts should decline to interfere in this manner. The reason, as set forth by the Second Circuit in *Gallina*, is that "the conditions under which a fugitive is to be surrendred to a foreign country are to be determined solely by the non-judicial branches of the Government." 278 F.2d at 79.

It is one thing for a federal court to decline to interfere with the treaty obligation of the Executive Branch to surrender a prisoner to a foreign government, once the court has determined that the prerequisites to extradition have been met. It is entirely different for a federal court to use its judicial power to compel a witness, under threat of incarceration for contempt, to provide testimony that may well lead to a successful foreign prosecution. There are two vital differences between these two situations. First, in the extradition cases, the significant power of remitting the citizen is being exercised by the Executive Branch; the Judicial Branch is simply declining to interfere in an area of traditional executive discretion. In cases like the instant one, however, where the witness asserts the privilege in an American court, the proper use of judicial rather than executive power is at issue.[8] Secondly, the extradition cases are concerned with possible Fifth Amendment violations—both the compulsion of the testimony and its use at trial—which might be committed by the foreign prosecuting government; there is no authority, however, for testing that government's actions against the Fifth Amendment. Precisely the opposite is true where the compulsion of testimony or its use at trial is attempted by an instrumentality of our government, for its actions are obviously limited by the Fifth Amendment.

---

8. In this connection, it is worth noting the distinction made by Justice Jackson dissenting in the Japanese-American relocation case, Korematsu v. United States, 323 U.S. 214, 248, 65 S.Ct. 193, 208, 89 L.Ed. 194 (1944):

I do not suggest that the courts should have attempted to interfere with the Army in carrying out its task. But I do not think they may be asked to execute a military expedient that has no place in law under the Constitution.

The Fifth Amendment may well be no restraint on governmental action to extradite a person who claims that his testimony will be compelled and used against him in a foreign court.[9] But the Amendment must be reckoned with when a person in an American court claims that his testimony is being judicially compelled here and may well be used in a foreign court. In this situation, the issue is not the availability of the privilege but its proper scope, i. e., whether the reasonably feared prospect of foreign use of testimony can be a basis for resisting its compulsion by an American court.[10] Since *Murphy* construed the privilege to have the same scope under our Constitution as it has in England, where it can be claimed to preclude foreign use of compelled testimony, the privilege can be claimed in this case at the point when the testimony is sought to be judicially compelled.

■ Finally, the Government suggests that if the privilege has sufficient scope to enable a witness given use immunity to decline answering questions for fear of foreign prosecution, law enforcement efforts, especially those concerned with the narcotics laws, will be frustrated. Of course, a constitutional privilege does not disappear, nor even. lose its normal vitality, simply because

its use may hinder law enforcement activities. That is a consequence of nearly all the protections of the Bill of Rights, and a consequence that was originally and ever since deemed justified by the need to protect individual rights. Moreover, it is largely up to the prosecuting authorities to shape the context in which a witness's claim of privilege will be assessed. They can decide not to ask questions which establish a context that gives a reasonable basis for a witness's fear of foreign prosecution. For example, the prosecutor here informed the Court that, wholly apart from the Mexican episode, he was interested in asking the witness about the identity of an individual *who was involved in a sale of* narcotics in the District of Connecticut. There appears to be no reason why this line of inquiry cannot, with care, be pursued in a context that creates no reasonable fear that the answers might be incriminating under foreign law. Questions concerning most violations of domestic law can be framed to avoid creating such a context. But that was not done with respect to the four questions currently at issue.

Accordingly, the Government's motion for an order compelling the witness to answer the four questions put to her is denied.

9. Though early cases had stated that Constitutional protections are totally inapplicable to crimes committed outside United States jurisdiction, e. g., Neely v. Henkel, *supra*, 180 U.S. at 122, 21 S.Ct. 302, 45 L.Ed. 448, there is at least a suggestion in more recent cases that the decision to turn an American citizen over to foreign prosecution is not to be made without some regard to constitutional limitations, though those limitations may well not be exceeded in a particular case. For example, in declining to interfere with *the decision to turn a soldier over to the* jurisdiction of Japanese courts pursuant to a provision of an Administrative Agreement, the Supreme Court observed: "We find no constitutional or statutory barrier to the provision as applied here. *In the absence of such encroachments,* the wisdom of the arrangement is exclusively for the determination of the Executive and Legislative Branches." Wilson v. Girard, 354 U.S. 524, 530, 77 S.Ct.

1409, 1412, 1 L.Ed. 1544 (1957) (emphasis added).

The Second Circuit has also expressed some doubt about the general proposition that procedures of the foreign jurisdiction need never be tested against constitutional limitations: "Nevertheless, we confess to some disquiet at this result. We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle set out above. This is not such a case." Gallina v. Fraser, *supra*, 278 F.2d at 79.

10. Similarly, the scope of the privilege would have to be determined when a person in an American court claims that testimony to be used here has been compelled abroad. The answer might well turn on the precise circumstances of the alleged compulsion.