**YVES FARMS, INC. and Yves Burgand, Plaintiffs,**

v.

**B. Max RICKETT, Max Rickett and Associates, Inc., Herman F. Klein, Jr., Michael Sadovic, Herbert L. Wells, and Eagle Agricultural Services, Inc., Defendants.**

**Civ. A. No. 86–174–3–MAC.**

United States District Court, M.D. Georgia, Macon Division.

May 13, 1987.

Stephen E. O'Day, Susan C. Kerr, Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., for plaintiffs.

Richard M. Kirby, Walter H. Bush, Jr., Hansell & Post, George C. Grant, Walter E. King, III, Martin, Snow, Grant, Frank H. Childs, Jr., Groover & Childs, Macon, Ga., for defendants.

**934**

FITZPATRICK, District Judge.

■ Pending before the court is Defendants' motion to compel certain testimony from Plaintiff Yves Burgand, a citizen of France. Burgand's deposition was noticed by Defendants for August 27, 1986. During that deposition session, Burgand refused to answer certain questions, claiming that the answers might incriminate him of violations under the criminal law of France. Plaintiff Burgand was deposed a second time during the month of February, 1987. Prior to the second deposition, Defendants filed their motion to compel, and the court held an emergency hearing the day before the scheduled deposition to discuss Burgand's refusal to testify. At that time, the court allowed Burgand to maintain his refusal to answer until the court could fully and adequately consider the question of whether Burgand can invoke the Fifth Amendment privilege against self-incrimination.[1]

## I. FACTS

Plaintiffs filed suit in this court pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, stating claims under that Act and for common law fraud, breach of contract, breach of fiduciary duty, and negligence. Plaintiffs allege that they were defrauded by Defendants pursuant to a scheme to attract and defraud French investors by selling them property for inflated prices after making fraudulent representations about the property.

Plaintiff Burgand, a French citizen, initially learned about the potential for agricultural investments in the United States through advertisements placed in French newspapers and magazines by Defendants and their affiliates. The advertisements encouraged French citizens to invest in agricultural property in the United States, including Georgia. Plaintiff Burgand formed Yves Farms, Inc. to purchase the property in question. Michael Sadovic, a named Defendant, is a French agricultural consultant who made the arrangements with the French investors for the investment in pecan farms in Georgia. Plaintiff Burgand alleges that Sadovic, in conspiracy with the other named Defendants, enticed Burgand and several other foreign investors to purchase farm land at inflated prices by making false representations about the return and income production of the farms. At the time of the investment, Mr. Burgand could, according to his pleadings, speak little English.

Burgand claims that Defendants made written misrepresentations to him regarding the production figures and production capability of the farm, and that these representations caused Mr. Burgand to believe that he would receive an average income of $140,000.00 per year from the pecan harvest from the farm for at least ten years following his purchase. Plaintiff Burgand alleges that his average income from the pecan harvest has been less than $35,-000.00 per year. The difference over the ten year period, amounting to more than one million dollars, provides the basis for Plaintiffs' damages claim in this case. Burgand additionally claims that he paid more for the farm than what it was worth, and has incurred expenses and losses in his attempts to operate the farm. Plaintiffs, and Defendants at Plaintiffs' request, have been unable to sell the farm.

Defendants seek to compel Mr. Burgand to answer the following questions, relating to the source of the money Burgand used to pay for the pecan farm in question:

**1.**

How did the money [used to buy the farm] get to a New York Bank?

**2.**

Are you worried about incriminating yourself for violations of United States law or French law?

---

1. The Fifth Amendment, in relevant part, provides that "No person ... shall be compelled in any criminal case to be a witness against himself ..." U.S. Const. amend V. Although the amendment specifies that the privilege shall apply in criminal cases, individuals may claim the privilege in civil cases where the testimony sought may implicate the claimant under criminal law. *See, e.g., Wehling v. Columbia Broadcasting System,* 608 F.2d 1084 (5th Cir.1979); *Campbell v. Gerrans,* 592 F.2d 1054 (9th Cir. 1979).

**3.**

Are you making a similar claim for any questions I might ask you about the transfer of funds from the country of France to the country of the United States?

**4.**

Did the money used to buy the Newberry farm come from France?

Defendants suspect that the funds used to pay for the land were removed from the country of France in violation of French customs law. French law provides that a French resident who removes funds from the country without following certain enumerated procedures faces a prison term of not less than one and not more than five years, confiscation of the funds that were illegally removed and confiscation of the means used to transport those funds, plus a criminal fine. Thus, Defendants' questions necessarily seek to obtain testimony from Burgand which may incriminate him if he removed the funds without following the French procedural mandates. The United States has no counterpart to these French currency laws.

After the dispute arose between Plaintiffs and Defendants, Plaintiff Burgand told Defendant Sadovic of the dissatisfaction of a separate French investor, who also purchased property through Defendants. Subsequently, according to Burgand's testimony, the other French investor received a visit in France from the French police who had with them a warrant with the account number of the investor's foreign bank account and the name of Mr. Sadovic. In addition, subsequent to the filing of this lawsuit by Plaintiff Burgand, Defendant Sadovic filed a claim against Plaintiff Burgand in the courts of France claiming, among other things, that Burgand violated French law when he removed the funds to purchase the pecan farm that is the subject of this lawsuit.

■ Defendants claim that the information as to how Plaintiff removed the funds from France is central to their defense. Defendants want to use this testimony to attack Burgand's credibility and to negate one of the essential elements necessary for a showing of fraud. A successful claimant in a suit for common law fraud must show that he reasonably relied on the defendants' misrepresentations. Defendants argue that if Burgand was attempting to quickly invest "hot", illegally removed money in the United States, he may have neglected to exercise due care in investigating his purchase of the farm, thus negating his reasonable reliance on the Defendants' representations.

The court has found no case authority from any federal court that squarely addresses the intriguing issue presented by the facts *sub judice*. The court has drawn from the scant related authority (primarily concerning foreign citizens' Fifth Amendment rights in the context of grand jury proceedings or congressional investigations) to answer the question:

Can a citizen of a foreign country, who elects to use the federal courts of the United States to pursue a civil cause of action against United States defendants, utilize the Fifth Amendment privilege against self-incrimination when the inculpatory testimony may incriminate him under the law of his home state, when there is no possibility of prosecution under any United States criminal statutes and when the foreign citizen's home state has no privilege similar to the privilege afforded by the Fifth Amendment?

**II. CONCLUSIONS OF LAW**

■ The Supreme Court, in the case of *Zicarelli v. New Jersey State Comm. of Investigation,* considered the issue of whether a claimant may assert a Fifth Amendment privilege when the inculpatory statements would incriminate him under foreign law. 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). The *Zicarelli* court never actually reached the question of whether a foreign citizen can invoke the Fifth Amendment privilege to protect himself from foreign prosecution. Instead, the court resolved the issue by establishing prerequisites which a claimant must meet before invoking the Fifth Amendment; first, the claimant must prove that he has a

"real" and "substantial risk" of foreign prosecution. 92 S.Ct. at 1676. The burden of proof is on the claimant. *Id.* Because Zicarelli failed to establish that the testimony sought would subject him to a real and substantial risk of foreign prosecution, the court declined to address the ultimate constitutional issue of whether Zicarelli would be entitled to receive the benefit of the Fifth Amendment privilege.[2]

Zicarelli was subpoenaed by the New Jersey State Commission of Investigation to testify concerning organized crime, racketeering, and political corruption in Long Branch, New Jersey. Zicarelli invoked the privilege against self-incrimination and refused to answer a series of questions, one of which was "In what geographical area do you have Cosa Nostra responsibilities?"[3] The Commission had granted Zicarelli immunity to protect him from prosecution in the United States, but Zicarelli feared that the answer to this particular question would expose him to danger of foreign prosecution. Neither the Fifth Amendment privilege nor the state grant of immunity could have protected him from either foreign prosecution or use of his inculpatory testimony by a foreign sovereign. The court reasoned that:

> It is well established that the privilege protects against real dangers, not remote and speculative possibilities. At the hearing before the Superior Court of Mercer County, appellant [Zicarelli] introduced numerous newspaper and magazine articles bearing upon his self-incrimination claim. He called a number of these articles to the court's attention in an effort to demonstrate the basis of a fear of foreign prosecution. These articles labeled appellant the "foremost internationalist" in organized crime, and detailed his alleged participation in unlawful ventures growing out of alleged interests and activities in Canada and the

Dominican Republic. While these articles would lend support to a claim of fear of foreign prosecution in the abstract, they do not support such a claim in the context of the questions asked by the Commission ...

*Id.* at 1675.

The court went on to determine that Zicarelli did not have a "real and substantial fear" of foreign prosecution from the testimony sought, because the context in which the question was asked indicated that it sought an answer concerning only geographical areas in New Jersey, and not geographical areas in other countries. Thus, the question did not require Zicarelli to disclose information that might incriminate him under foreign law. The court determined that even if Zicarelli had international Cosa Nostra responsibilities, he could have answered the question as phrased truthfully without disclosing what those responsibilities were. "To have divulged international responsibilities would have been to volunteer information not sought, and apparently not relevant to the Commission's investigation." 92 S.Ct. at 1676. The court concluded that:

> Should the Commission inquire into matters that might incriminate him under foreign law and pose a substantial risk of foreign prosecution, and should such inquiry be sustained over a relevancy objection, then a constitutional question will be squarely presented. We do not believe that the record in this case presents such a question.

*Id.*

The Eleventh Circuit has further refined the *Zicarelli* prerequisites. *In re President's Comm. on Organized Crime,* 763 F.2d 1191 (11th Cir.1985). However, the Eleventh Circuit also concluded that the claimant had no real and substantial risk of foreign prosecution, thus declining to resolve the ultimate constitutional question

---

**2.** In accordance with Supreme Court precedent, the *Zicarelli* court did not anticipate the constitutional law question in advance of the necessity of deciding it. "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case". *Ashwander v. Tennessee Valley Authori-*

*ty,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936).

**3.** "Cosa Nostra" denotes a "family dedicated to or whose principle is to pursue crime and protect those of its members who do commit crime." 92 S.Ct. at 1675, fn. 17.

of whether a foreign citizen may benefit from the Fifth Amendment privilege when facing potential foreign prosecution. Scaduto, the appellant in *President's Commission*, was questioned about his knowledge on certain aspects of organized crime pursuant to an executive investigation initiated by President Reagan. *See* Exec. Order 12435, § 2(a), 48 Fed.Reg. 34, 723 (1983). At the time of questioning, Scaduto was a federal prisoner serving a sixty-four year term of imprisonment following his conviction for various violations of the Drug Act. Scaduto refused to testify before the Commission concerning several matters, arguing that his testimony might subject him to foreign prosecution in Italy.

Although domestic immunity had been conferred upon Scaduto, this immunity was insufficient to protect him from Italian prosecution. A warrant for Scaduto's arrest had been issued in Italy on drug trafficking charges, and the country of Italy had requested that Scaduto be extradited. This extradition request had been formally denied by the State Department. The court, following *Zicarelli*, determined that:

> ... A claimant asserting that a Fifth Amendment privilege is necessary to protect him from the threat of foreign prosecution must demonstrate first that the information that might be disclosed through his testimony might incriminate him under foreign law, and second that his fear of foreign prosecution is real and substantial rather than merely speculative.

*Id.* at 1198. The court went on to identify a number of factors to be considered in determining the "real and substantial" fear requirement, including whether there "is an existing or potential foreign prosecution of the claimant; whether any of the charges would entitle the foreign jurisdiction to have him extradited; and whether there is a likelihood that his testimony would be disclosed to the foreign government." *Id.* at 1198. Because Scaduto's

extradition to Italy was so improbable, in light of the State Department's denial of the extradition request, and in light of Scaduto's confinement in a United States penitentiary, the court concluded that Scaduto did not have a real and substantial fear of Italian prosecution.[4] *Id.* at 1199. Furthermore, the court felt that the extreme secrecy of the investigative proceedings greatly reduced the likelihood that Scaduto's testimony would be disclosed to the Italian government. *Id.*

*Zicarelli* and *President's Commission* delineate the analysis that the court must apply in determining Plaintiff Burgand's rights, although the two cases are clearly distinguishable from the facts before the court. Thus, the court will first address the prerequisite factors before moving on to a determination of the constitutional question itself.

### A. IS IT LIKELY THAT THE INFORMATION SOUGHT MIGHT INCRIMINATE BURGAND UNDER FRENCH LAW?

The testimony sought by Defendants would require Burgand to divulge the manner by which he got the funds to purchase the farm in question out of the country of France. French law provides that:

> Article I—Operations of ... movements of capital ... of any nature between France and abroad ... without the prior authorization of the Economics and Finance Minister shall be effectuated by appointed intermediary institutions.

> Article III—Without the authorization of the Economics and Finance Minister, all transfers ... in France having the purpose of holding the assets of a resident abroad are prohibited....

> Article IV—Transfers of any nature effectuated by a resident to any foreign destination are subject to the prior authorization of the Economics and Finance Minister.

---

**4.** The possibility of extradition, though improbable, was not inconceivable in Scaduto's case. The court recognized that Scaduto's conviction could be reversed on appeal, retrial not sought, and the Italian government could again request

extradition. However, "such a danger [appeared] to be of precisely that speculative variety that the court found insufficient to support the assertion of a privilege in *Zicarelli.*" 763 F.2d at 1199.

J.O. 25 nov., p. 11081 (1968), Decree No. 68–1021 (English Translation). *See also* J.O. 29 janv., p. 1073 (1967), Decree No. 67–78.

Violations of these articles subject an individual to the possibility of several years in prison and extensive fines. Decree No. 68–1021, Art. VI (amended in 1969 to reflect more severe penalties). The testimony sought from Burgand could show violations of these regulations, and could conceivably result in Burgand's prosecution under the regulations. The first requirement of the *Zicarelli/President's Commission* test has been satisfied, and the court must go on to determine whether Burgand's fear that he might be prosecuted under those regulations is real and substantial.

### B. DOES BURGAND HAVE A "REAL AND SUBSTANTIAL" FEAR OF PROSECUTION UNDER THESE CURRENCY REGULATIONS?

After careful consideration of the *President's Commission* factors, this court has concluded that Mr. Burgand does have a real and substantial fear of prosecution.

#### 1. Existing or Potential Prosecution

Because no prosecution of Burgand has been initiated, the court must focus instead on the threat of a potential prosecution. Defendants argue that Burgand has failed to show any real threat of prosecution, and that the possibility of prosecution is remote and speculative. The court does not agree, and feels that the compelled testimony could very well initiate prosecution of Burgand.

Particularly compelling to the court's belief that the potential for Burgand's prosecution is real is the existence of a lawsuit brought by Defendant Sadovic, as Plaintiff, against Burgand, in a French civil court, alleging that Burgand removed the funds to buy the farm in question in violation of French currency law. The court is aware that the proceedings in the French court are of a civil, rather than criminal nature, and that the pleadings in that case allege only that Burgand "might have" violated French criminal law rather than that he

actually "did" violate French criminal law. However, the court need not engage in speculation or conjecture to come to the reasonable conclusion that, if Burgand must admit in this proceeding that he violated the very law that is the subject of the civil proceeding brought by Sadovic in France, Sadovic will use Burgand's compelled inculpatory testimony in the French proceeding. It is reasonable to assume that the French authorities could easily have knowledge of the French civil proceeding, and would use Burgand's testimony in a criminal prosecution. *"Zicarelli* does not appear to require any indication that a foreign prosecution is imminent." *In re Cardassi,* 351 F.Supp. 1080, 1085 (D.Conn.1972).

To further convince the court that the potential for foreign prosecution is real, Mr. Burgand testified that another similarly situated investor, after expressing his dissatisfaction with property purchased from Defendants, was visited by French police with an arrest warrant. Although the case was ultimately dismissed, a prosecution was initiated. Burgand also provided the court with a newspaper account of an individual in an unrelated transaction who was prosecuted and received a stiff penalty under the same French currency laws in question.

The *Zicarelli* court determined that the claimant had no real and substantial fear of prosecution because the testimony sought could be truthfully given without the disclosure of any violations of foreign law. On the contrary, the testimony sought from Burgand would require him to testify directly about whether or not he followed all necessary procedures in removing the funds from France. *Zicarelli* is thus distinguishable on the issue of possibility of prosecution.

#### 2. Likelihood of Disclosure

The court feels, also because of the pendency of the civil proceeding brought by Sadovic in France, that there is a substantial likelihood that Burgand's testimony would come to the attention of the French authorities. Unlike the claimants in *Zicar-*

*elli* and *President's Commission,* where the testimony was being sought in the secrecy of executive investigations, Burgand cannot rely on the premise that those seeking the testimony will not furnish it to a foreign government. In fact, the *Cardassi* court held that the claimant faced a likelihood of disclosure to the foreign government even when the testimony was sought in the secrecy of grand jury proceedings. 351 F.Supp. at 1084.

### 3. Possibility of Extradition

Burgand currently resides in France, so the issue of extradition is moot. The claimant in *President's Commission* was confined in the United States, and his extradition to Italy had been formally denied by the State Department, but Burgand is clearly within the reach of the French prosecutors. Even if Burgand were to move to the United States, the offense is one which would subject the offender to extradition. Supplementary Convention to the Extradition Convention of 1909, Feb. 12, 1970, United States-France, Art. VI, 22 U.S.T. 407, TIAS No. 7075.

The court has concluded that Burgand *does have a real and substantial fear of* prosecution, and that his case is distinguishable from the cases of the claimants in *Zicarelli* and *President's Commission.* Having held that Burgand meets the threshold test, the court must now reach the constitutional question of whether Burgand, a foreign citizen, may exercise the Fifth Amendment privilege when a potential prosecution would take place solely pursuant to foreign law.

### C. IS BURGAND ENTITLED TO THE PRIVILEGE AFFORDED BY THE FIFTH AMENDMENT?

The only circuit decision found by the court addressing this question is the Fourth Circuit's opinion in *United States v. (Under Seal),* 794 F.2d 920 (4th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).[5] The claimants in *Under Seal* were citizens of the Philippines. The court determined that the claimants had established a real and substantial risk of Philippine prosecution, because the Philippine government had begun prosecution against these citizens on charges congruent with subjects comprising the grand jury investigation in question, and because the record indicated a substantial likelihood of extradition for the alleged violations. The court then went on to consider the constitutional question of whether a Fifth Amendment privilege extends to foreign citizens, where the testimony is being sought in connection with grand jury proceedings, and where the testimony may be used against the foreign citizens in a prosecution in the country of their citizenship. The court concluded that no Fifth Amendment privilege was available to the Philippine citizens:

> By its terms, the Fifth Amendment does not purport to have an effect in foreign countries; and ordinarily, unless specifically stated otherwise, a provision of domestic law, statutory or constitutional, is deemed to apply only to the jurisdiction which enacts it. Thus, it seems quite certain that the Fifth Amendment would not prohibit the use of compelled self-incriminatory evidence in a Philippine pros-

---

**5.** The Supreme Court ultimately denied the *Under Seal* claimants' petition for a writ of certiorari, with three Justices voting to grant certiorari. *Araneta v. United States,* — U.S. ——, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986). However, before certiorari was denied, the claimants applied for a stay of the contempt order entered against them as a result of the Fourth Circuit's decision in their case. *See Araneta v. United States,* — U.S. ——, 107 S.Ct. 1, 93 L.Ed.2d 303 (1986). Chief Justice Burger, as Circuit Justice, granted the stay after finding that:

> It [was] more likely than not that at least five Justices will agree with the Court of Appeals

that the applicants face the kind of risk found lacking in *Zicarelli,* and will therefore reach and decide the question reserved in that case. And although such matters cannot be predicted with certainty, I conclude there is a "fair prospect" that a majority of this Court will decide the issue in favor of the applicants. *Id.* 107 S.Ct. at 2. Justice Burger also noted that "Substantial confusion exists on [the] issue" of "whether the privilege against self-incrimination protects a witness from being compelled to give testimony that may later be used against him in a foreign prosecution." *Id.*

ecution if Philippine law countenanced its use.

. . . . .

*Id.* at 925.

... We conclude that the Fifth Amendment privilege applies only where the *sovereign* compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment from compelling self incrimination.... Since the Fifth Amendment would not prohibit the use of compelled incriminating testimony in a Philippine court, it affords an immunized witness no privilege not to testify before a *federal grand jury* on the ground that his testimony will incriminate him under Philippine law.

*Id.* at 926 (emphasis added).

While Defendants in this case argue that *Under Seal* directly controls these facts, the court notes a crucial difference: The "sovereign" is not the party seeking to compel the testimony in this case. Rather, the compelled testimony is sought by private defendants in a civil action who stand to benefit not only from the testimony itself, but from the possibility that the plaintiff will dismiss his suit rather than testify if the motion is granted.

The *Under Seal* court emphasized the context in which the testimony was sought, stating that:

Just as comity among nations requires the United States to respect the law enforcement processes of other nations, our own national sovereignty would be compromised if our system of criminal justice were made to depend on the actions of foreign government beyond our control. It would be intolerable to require the United States to forego evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country. Our conclusion in this re-

spect is reinforced by the authorities that hold, as a matter of domestic law, that the Fifth Amendment privilege does not protect the witness against *all* adverse uses of his compelled testimony, but only those adverse uses specifically proscribed by the Fifth Amendment ...

*Id.*

These considerations are inapplicable in the case of a foreign plaintiff whose testimony is being compelled by private party defendants, especially when the issue is collateral, rather than central to the merits of the case. Even in situations similar to the *Under Seal* case, several district courts have held that the Fifth Amendment does protect against compelled testimony which would incriminate an individual under foreign law. *See Mishima v. United States,* 507 F.Supp. 131 (D.Alaska 1981); *United States v. Trucis,* 89 F.R.D. 671 (E.D.Pa. 1981); *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972); *In re Flanagan,* 533 F.Supp. 957 (E.D.N.Y.), *rev'd* 691 F.2d 116 (2nd Cir.1982).[6]

■ While the court realizes that the plaintiff has voluntarily availed himself of the United States courts to pursue his cause of action, the court refuses to accept Defendants' argument that the plaintiff must have his law suit dismissed unless he answers questions on a collateral issue that might initiate foreign prosecution. The potential implications that the compelled testimony would have for Mr. Burgand are serious, and far outweigh any potential inconvenience to Defendants. The court looks to the case of *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, (5th Cir.1979) for guidance in its analysis of the applicability of the Fifth Amendment privilege when invoked by a plaintiff in a civil action.

The *Wehling* case involved a libel action brought by Plaintiff Wehling against De-

**6.** The *Flanagan* case was later reversed based on the appellate court's finding that there was no real and substantial risk of prosecution, but the appellate court did not address the lower court's decision that foreign citizens do have a Fifth Amendment right. *In re Grand Jury Subpoena of Flanagan,* 691 F.2d 116 (2nd Cir.1982). The

second circuit, in finding no real and substantial risk, also relied on the principles of the secrecy of grand jury proceedings and determined that there was little or no likelihood of disclosure to the foreign government. *Id.* at 123.

fendant CBS for a broadcast indicating that Wehling was involved in illegal activities. Wehling refused to testify as to whether or not he was actually involved in these illegal activities, invoking the protection of the Fifth Amendment. The questions posed by CBS to Wehling about his illegal activities were at the very heart of the case, as truth would have provided CBS with an absolute defense to the libel action. The Fifth Circuit stated that "Dismissing a plaintiff's action with prejudice solely because he exercised his privilege against self-incrimination is constitutionally impermissible."

*Id.* at 1087. The court went on to state that:

> We do not dispute CBS's assertion that it would be unfair to permit Wehling to proceed with his law suit and, at the same time, deprive CBS of information needed to prepare its truth defense. The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue. To hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do ... Wehling, however, has not claimed the right to proceed to trial without answering the questions posed by CBS during the deposition. Instead, Wehling asks only that discovery be stayed until all threat of criminal liability has ended. We must decide whether, under the circumstances of this case, plaintiff should have been required to forego a valid cause of action in order to exercise his constitutional right to avoid self-incrimination.

*Id.* at 1087 (citations omitted).

The *Wehling* court remedied the situation by staying the case for several years to allow the statute of limitations on the alleged crime to run. This court does not feel, in the case *sub judice*, that such a remedy is necessary. While the court hesitates to say that the information sought by Defendants is irrelevant, it is, at most, a means of attacking Burgand's credibility and one of many ways by which Defendants can negate one element of one of Plaintiff's claims. Defendants have other means of proving that Burgand's reliance on any alleged misrepresentations were not reasonable. For example, the court's holding does not prohibit Defendants from investigating into the length of time that elapsed between the time that the money was deposited in the New York Bank and the time that Burgand purchased the farm, or from questioning Burgand concerning his inquiries about the property prior to the purchase. Prohibiting these defendants from finding out from Burgand himself whether or not the money was illegally removed will not foreclose their primary avenues to determining the reasonableness of Burgand's reliance.

■ Defendants have cited one case in which the court dismissed a lawsuit due to the plaintiff's invocation of the Fifth Amendment privilege. *Lyons v. Johnson*, 415 F.2d 540 (9th Cir.1969). However, the plaintiff in *Lyons* refused to submit to any discovery whatsoever, including routine questions about her background, relying on a blanket Fifth Amendment privilege. The *Lyons* facts are inapposite to the facts of this case, as Plaintiff Burgand has complied with extensive discovery on all claims and defenses relevant to the case save the issue involving the source and transport of the funds used to purchase the property.

The court is mindful that under the principle of *Ashwander v. Tennessee Valley Authority*, the holding of the court is strictly limited to the facts in this unique case. 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). However, under the particular facts of this case, Defendants' motion to compel is DENIED

SO ORDERED.