In re Grand Jury Witness Kaare
GILBOE, Jr.

UNITED STATES of America, Appellee,

v.

Kaare GILBOE, Jr., Appellant.

No. 767, Docket 82–6302.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1982.

Decided Jan. 14, 1983.

Neal Factor, Long Island City, N.Y. (Factor & Shweky, Long Island City, N.Y., on the brief), for appellant.

Michael S. Feldberg, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., and Walter P. Loughlin, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before FRIENDLY, TIMBERS, and WINTER, Circuit Judges.

TIMBERS, Circuit Judge:

The question presented on this appeal is whether the District Court for the Southern District of New York, Irving Ben Cooper, *District Judge*, properly adjudged a grand jury witness, who had been granted immunity, to be in civil contempt for refusal to answer questions on the ground of his Fifth Amendment privilege against self-incrimination because of his asserted fear of prosecution in various foreign countries. We hold that the witness was properly adjudged in contempt. We affirm.

Kaare Gilboe, Jr., a non-resident Norwegian national, was held in contempt on November 2, 1982 pursuant to 28 U.S.C. § 1826(a) (1976). He filed a notice of appeal on November 19. The appeal was argued on December 13. In view of the time stricture of § 1826(b), and after full consideration, we entered an order on December 20 affirming the contempt order with a notation that an opinion would follow. This is that opinion.

I.

Gilboe is no stranger to this Court. *United States v. Gilboe*, 684 F.2d 235 (2 Cir. 1982), *petition for cert. filed*, 51 U.S.L.W. 3342 (U.S. Oct. 22, 1982).

Prior to being summoned before the present grand jury, Gilboe had been convicted in the Southern District of New York on charges of fraud. The charges against Gilboe arose from activities he had directed from overseas. The grand jury was inquiring about those activities or related matters. He claimed that he could not testify regarding his overseas schemes without subjecting himself to a substantial risk of prosecution in foreign countries. To understand this claim, we shall briefly outline his tangled skein of deception based on the record of his prior conviction which we affirmed. 684 F.2d 235.

In what we have described as a "massive fraud on the international shipping industry [leaving] victims on the continents of Asia, North America, and Europe", *id.* at 236, Gilboe leased out phantom cargo vessels. Clothed in the raiment of a respectable ship broker, he made contracts for the carriage of cargo, known in the trade as "fixtures", even though he had no ships. Once the fixture was secured, he made independent arrangements with the ship owner for the transportation of the cargo. When the consignee paid Gilboe the "freight", or carriage fee, he simply pocketed the money without passing along payment to the ship owner. After Gilboe absconded with the freight, the consignee was forced to pay again, this time to the ship owner, in order to secure delivery of the goods.

Two sets of brokerage transactions involving the People's Republic of China gave rise to Gilboe's prosecution and ultimate conviction in this country. The first occurred in 1978–1979, when Gilboe operated from a ship brokerage firm in Hong Kong to obtain a contract for the transportation of grain from Argentina to China. He then contracted with a Panamanian shipping company, Libra Shipping, for freighters. Libra substituted Librand Shipping, Ltd., a British corporation, for itself. Ultimately an Indian owned vessel was provided. The People's Republic wired the freight to Gilboe who never paid the ship owners. To avoid the shippers' lien on the grain, the People's Republic was forced to pay the freight again.

In his second set of transactions with the People's Republic, in 1980, Gilboe worked from Tokyo. After obtaining a contract to carry grain from the United States to China, he obtained three vessels, of Danish, Greek and Indian origin, respectively. Again the People's Republic wired the freight to Gilboe. He failed to pay the ship owners. The People's Republic was forced to pay twice for the transportation of its grain.

To carry out these transactions, Gilboe managed to spin a web of fraud across several continents. He entangled in his schemes Panamanian and British ship brokers; Norwegian and British shipping companies; Indian, Danish, and Greek ship owners; and banks in the United States, Hong Kong, Canada, the Bahamas, and the Cayman Islands.

Gilboe ran afoul of the laws of the United States because of certain communications between him and parties in the United States and transfers of funds through conduit United States banks. On November 6, 1981, he was convicted after a jury trial in the Southern District of New York of wire fraud, 18 U.S.C. § 1343 (1976), and of transportation of money obtained by fraud, 18 U.S.C. § 2314 (1976). He was sentenced to a prison term of 20 years on seven of the eight counts and was ordered to pay a fine of $43,000. On the remaining count, sentence was suspended and he was placed on probation for five years beginning with his release from prison, a condition of his probation being that he make restitution to the victims of his fraud. He is presently incarcerated. On July 23, 1982, we affirmed his conviction. *United States v. Gilboe, supra.*

II.

The events which led to Gilboe's adjudication of contempt began in April 1982 when he was summoned to testify before a grand jury that was investigating fraud in the international shipping industry. The grand jury sought to question Gilboe about the participation of others in his schemes and the disposition of the proceeds of the

frauds. After testifying for 30 minutes on April 14, he abruptly refused to continue without a Norwegian-English interpreter being present.[1]

On April 27 he again was summoned before the grand jury. An interpreter was present. He persisted in refusing to testify, this time on the ground of his asserted Fifth Amendment privilege. On April 29, upon the government's application, Judge Sprizzo signed an order of immunity pursuant to 18 U.S.C. § 6003 (1976).

On April 30 Gilboe returned to the grand jury. Despite the grant of immunity, however, he persisted in refusing to testify, again invoking his privilege against self-incrimination. At a hearing before Judge Sprizzo, Gilboe moved to quash the grand jury subpoena on three grounds: first, that the requested testimony might prejudice his then pending appeal; second, that the grand jury lacked jurisdiction; and finally, that answers to the questions put to him would incriminate him under the laws of several foreign countries. After receiving briefs, Judge Sprizzo denied the motion to quash in all respects.

On November 2 Gilboe again returned to the grand jury. He continued to persist in his refusal to testify. After being directed first by the foreman and then by Judge Cooper to answer questions, he continued to refuse, claiming that his refusal was based on his fear of foreign prosecution. Upon his refusal to comply with Judge Cooper's order, the judge orally adjudged him to be in civil contempt of court. A written contempt order was entered on November 4. Gilboe was ordered confined at a suitable place until such time as he complies with the orders of the court and testifies before the grand jury or until the expiration of the term of the grand jury, but in no event for more than 18 months. His 20 year sentence

referred to above was ordered stayed during his confinement pursuant to the contempt order.

From his civil contempt order, Gilboe has taken this appeal.

III.

Despite the shifting sands upon which Gilboe has grounded his refusals to testify before the grand jury, the sole claim raised on this appeal is that such testimony would expose him to prosecutions in foreign countries in contravention of his privilege against self-incrimination.

■ When a witness is granted use immunity pursuant to 18 U.S.C. §§ 6002 and 6003, ordinarily he may not refuse to testify on the ground of his Fifth Amendment privilege against self-incrimination, since he is protected against the direct or derivative use of such testimony against him in any subsequent federal or state prosecution. *Kastigar v. United States,* 406 U.S. 441, 459, 462 (1972). Such use immunity "affords the same protection [as the Fifth Amendment privilege] by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties." *Id.* at 461. Such immunity "is coextensive with the privilege and suffices to supplant it." *Id.* at 462.

■ A witness' claim that his testimony will incriminate him with respect to a prosecution in a foreign country is on a different footing. Use immunity granted by a court in the United States cannot foreclose a foreign prosecution. At the moment it is an open question whether the Fifth Amendment privilege against self-incrimination may be invoked in a proceeding in the United States when the witness' fear is of incrimination in a foreign country.[2] Before

---

1. Aside from his half hour of testimony on April 14 without an interpreter, he had testified without an interpreter for more than a day at his trial in 1981 referred to above. Nevertheless, the court on April 14 ordered that an interpreter be provided for him and he had such an interpreter at all subsequent proceedings.

2. The Supreme Court left the question open in *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 478–81 (1972), where an alleged racketeer claimed that his testimony before the commission would expose him to the danger of foreign prosecution. The Court concluded that it was unnecessary to reach that constitutional issue because the dan-

the Fifth Amendment issue is reached, however, we have required the witness asserting the privilege to demonstrate "a real and substantial risk, as distinguished from a mere possibility, that answers to questions might provide a link which would lead to incrimination of him and be used ·in a foreign prosecution of him." *United States v. Flanagan, supra* note 2, at 121 (citing *California v. Byers,* 402 U.S. 424, 431 (1971), and *id.* at 437–38 (Harlan, J., concurring); *Marchetti v. United States,* 390 U.S. 39, 48 (1968) (Harlan, J.)). This threshold showing of substantial risk is required because "the [Fifth Amendment] privilege protects against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey State Commission of Investigation, supra* note 2, at 478 (footnote omitted).

In a somewhat different context, in *United States v. Yanagita, supra* note 2, at 946, we rejected the Fifth Amendment claim of an American citizen who refused to testify about his activities in this country because of his asserted fear of foreign prosecution. We stated that *"Zicarelli* makes it clear that one invoking the Fifth Amendment privilege has the burden of establishing, first, that the subject of the government's questions raises 'a real danger of being compelled to disclose information that might incriminate him under foreign law', and second, that there is a 'real and substantial' fear that prosecution by the foreign government might ensue." As for a witness' fear of foreign prosecution, "[t]he apprehension must be a real and reasonable one, based on objective facts as distinguished from [the witness'] subjective speculation", and there must be "a particularized showing that the testimony may in-

criminate the witness in the foreign prosecution." *United States v. Flanagan, supra* note 2, at 121. Otherwise a witness might frustrate virtually any criminal investigation with international dimensions simply by pointing to a speculative risk of incrimination in a foreign country.

## IV.

█ We turn next to the five factor test set forth in *United States v. Flanagan, supra,* to be considered when a Fifth Amendment claim is asserted as to foreign prosecutions. This test, which is built on the language of *Zicarelli v. New Jersey State Commission of Investigation, supra,* and *United States v. Yanagita, supra,* is as follows:

"... the court in resolving the issue must then focus on such questions as [1] whether there is an existing or potential foreign prosecution of him; [2] what foreign charges could be filed against him; [3] whether prosecution of them would be initiated or furthered by his testimony; █ whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and █ whether there is a likelihood that his testimony given here would be disclosed to the foreign government." (numbers in brackets added.)

*United States v. Flanagan, supra* note 2, at 121. Our analysis of the application of these factors to the instant case leads us to the conclusion that there was no real and substantial risk that Gilboe's grand jury testimony would have subjected him to foreign prosecution.[3]

---

ger was not substantial. We too recently have declined to reach the issue. *United States v. Flanagan,* 691 F.2d 116, 124 (2 Cir.1982). *See also United States v. Yanagita,* 552 F.2d 940, 946 (2 Cir.1977) (issue not reached because fear of foreign prosecution was insubstantial). Other courts have reached differing conclusions on the applicability of the Fifth Amendment in this context. *Compare, e.g., Mishima v. United States,* 507 F.Supp. 131, 134–35 (D.Alaska 1981); *United States v. Trucis,* 89 F.R.D. 671, 673 (E.D.Pa.1981) (mem.); *In re Cardassi,* 351 F.Supp. 1080, 1085–86 (D.Conn.

1972) (holding that privilege applies), *with In re Parker,* 411 F.2d 1067, 1070 (10 Cir.1969), *vacated as moot sub nom. Parker v. United States,* 317 U.S. 96 (1970); *In re Weir,* 377 F.Supp. 919, 924 (S.D.Cal.), *aff'd,* 495 F.2d 879 (9 Cir.1974) (holding that privilege does not apply).

3. Of the five factors set forth in *United States v. Flanagan, supra,* [2] and [4] tend to weigh in Gilboe's favor; [1], [3] and [5] weigh against him to one degree or another. We shall discuss these factors in that portion of our opinion that follows.

Gilboe was asked to testify before the grand jury about the participation of others in his frauds and the disposition of the proceeds of those frauds. Since most of Gilboe's activities took place abroad, the risk of foreign prosecution cannot be so easily dismissed as would be the case if the inquiry were solely into activities in this country—beyond the ordinary reach of for-eign governments. *Cf. United States v. Flanagan, supra* note 2, at 124 (questions restricted to activities in the United States); *United States v. Yanagita, supra,* 552 F.2d at 946–47 (same).

An examination of the type of questions put to Gilboe—before he refused categorically to answer all questions—suggests that no substantial risk of prosecution would have resulted from his answers. Of the four questions asked,[4] only one arguably involved Gilboe's own conduct; the rest concerned his acquaintance with other persons. Yet he flatly refused to answer *all* questions. We find nothing in this record to demonstrate that Gilboe's compliance with the order to testify would have forced him to divulge information that would have incriminated him under foreign law.

We may assume that the underlying scheme on which Gilboe's conviction in the United States was based could also constitute the predicate for prosecution under the laws of several foreign countries. For example, Gilboe may have committed fraud under the laws of both Japan and Hong Kong[5] when he conducted his operations from those countries. Since the shipping schemes victimized persons in several other countries, it also is possible that Gilboe violated the antifraud laws of those other

countries as well. Assuming arguendo—on the basis of the one possibly incriminating question asked of him before the grand jury—that the government sought to compel him to testify about the activities for which he was convicted in the United States, and that such testimony might have elicited information pertaining to potential violations of foreign laws.

Viewing Gilboe's claims of fact and law in the light most favorable to him and assuming arguendo that the grand jury inquiry was intended to probe into frauds that may have violated foreign as well as United States laws, it remains for Gilboe to establish the second requirement we enunciated in *United States v. Yanagita, supra* note 2, at 946, that "there is a 'real and substantial' fear that prosecution by the foreign government might ensue." This he has not done.

Although the acts for which Gilboe says he fears foreign prosecution occurred between 1978 and 1980, no "present or prospective foreign prosecution" is apparent. *United States v. Flanagan, supra* note 2, at 124. This lapse of time without official action cuts against the likelihood of foreign interest. Gilboe has asserted only claims of shadowy investigations, with no documented support. He has tendered a spate of newspaper clippings, many from the United States. Nothing else backs his claims that foreign governments have expressed an interest in prosecuting him.

The existence of foreign interest in prosecuting Gilboe is dubious for other reasons. He is in the midst of serving his 20 year prison sentence in the United States.[6] The

4. Consistent with the traditional secrecy accorded to grand jury testimony, we decline to disclose in this opinion the substance of the questions asked.

5. Both Japan and Hong Kong have antifraud laws that might be applicable to Gilboe. *E.g.,* Keihō (Penal Code), Law No. 45 of 1907, art. 246(1) (Japan): "A person who has defrauded another person of his property shall be punished with penal servitude of not more than ten years"; Laws of Hong Kong, vol. 11, ch. 210 at § 17(1) (rev. ed. 1980): "Any person who by any deception (whether or not such deception

was the sole or main inducement) dishonestly obtains property belonging to another, with the intention of permanently depriving the other of it, shall be liable ... to imprisonment for 10 years."

We of course do not presume to suggest whether Gilboe has violated foreign laws. We note only their existence and possible applicability.

6. Although at argument Gilboe's counsel indicated that he had reason to believe that a commutation of Gilboe's sentence might be in prospect, he was unable to comply with our

fact that he is being punished here may dissuade other countries from undertaking their own prosecutions. This is particularly so because until Gilboe completes his sentence and term of probation other countries must extradite him from the United States before they can prosecute him. As a practical matter extradition is unlikely. Article VI of the treaty that governs extradition between the United States and the United Kingdom—which also applies to Hong Kong and the Cayman Islands—provides that extradition must be deferred until the full execution of punishment if the person sought is under punishment in the territory of the requested party.[7] Only after full execution of his sentence would Gilboe be available for extradition under that treaty. Similarly, Article IV (3) of our extradition treaty with Japan grants the United States the option of deferring surrendering the person sought to be extradited until full execution of his punishment in this country.[8]

Not only is extradition before the conclusion of Gilboe's sentence in all likelihood foreclosed as a matter of law, but there is very little incentive for a foreign government to spend time and money on extradition proceedings while Gilboe is serving a prison sentence in the United States. Moreover, upon his release from custody in this country there will be little incentive for a foreign government to mount a costly extradition proceeding for what at that point will be a stale case. The stark fact of Gilboe's lengthy sentence, in tandem with the problems of extradition, strongly militate against the objective reasonableness of his fear of foreign prosecution.[9]

Even if one of the potentially interested countries decided at some point to prosecute Gilboe and could extradite him, his testimony would not greatly further the prosecution. Nor would the information Gilboe might disclose in his grand jury testimony be likely to invite such prosecution. There is little doubt about the basic facts of the shipping frauds. Gilboe admitted his participation.[10] The evidence of his guilt in those schemes was overwhelming. The district court characterized his exculpatory explanation—that he was the pawn of others —"a tissue of perjury." *United States v. Gilboe, supra,* 684 F.2d at 237. It therefore is unlikely that Gilboe's grand jury testimony would have disclosed any significant new facts about his well-established guilt in the fraudulent schemes.

Furthermore, his testimony about the participation of others and the disposition of the proceeds presumably would not have contradicted his prior testimony that others

request for substantiation. A letter from the Assistant United States Attorney indicated that the Office of the Pardon Attorney was unaware of any application for executive clemency on Gilboe's behalf.

7. This treaty provides:
"If the person sought should be under examination or under punishment in the territory of the requested party for any other offense, his extradition shall be deferred until the conclusion of the trial and the full execution of any punishment awarded to him." Extradition Treaty Between the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972—Oct. 21, 1976, art. VI, 28 U.S.T. 227, 230 T.I.A.S. No. 8468.

8. This treaty provides:
"When the person sought has been prosecuted or has not undergone the execution of punishment in the territory of the requested Party for an offense other than that for which extradition is requested the requested Party may defer his surrender until the conclusion of the trial and the full execution of any punishment...." Extradition Treaty Between the United States of America and Japan, March 3, 1978, art. IV, para. 3, T.I.A.S. No. 9625.

9. In this respect, the instant case is distinguishable from *In re Cardassi, supra* note 2, at 1080. There the witness was available for immediate extradition to Mexico. Moreover, the questions asked of Cardassi focused to a much greater extent on her criminal activities in Mexico.

10. Aside from his objections to the court's jurisdiction and venue, Gilboe's defense on the merits to the fraud charges was that he had been no more than a factotum in the scheme. He did not dispute the fact of his intimate involvement in the fraudulent transactions with the People's Republic of China. *United States v. Gilboe, supra,* 684 F.2d at 237.

masterminded the operations. As for his own guilt, he was asked essentially to admit no more than what he had already admitted and what was obvious. Since the basic facts concerning Gilboe's role in the schemes are incontrovertible, and since his grand jury testimony would have added little to what was already known, we hold that he has not shown a real and substantial risk that "prosecution ... would be initiated or furthered by his testimony." *United States v. Flanagan, supra* note 2, at 121.

The unlikelihood that Gilboe's grand jury testimony would come to the attention of foreign governments is another indicator of the insubstantiality of the risk of prosecution. Although we held in *United States v. Flanagan, supra* note 2, at 124, that the measures taken to ensure the secrecy of grand jury proceedings were not alone sufficient to defeat a claim of privilege based on the fear of foreign prosecution, the improbability of disclosure is certainly *one* factor that bears on the risk.

The measures provided to assure non-disclosure of Gilboe's grand jury testimony cannot be dismissed lightly. Fed.R.Crim.P. 6(e) imposes tight restrictions on the use of information communicated to a grand jury. Disclosure without court order is allowed to be made only to the prosecutor and to government employees who need the information to assist the prosecutor. *Id.* at (3)(A)(i) and (ii). Those who receive the information in order to assist the prosecutor may use the information only for that purpose. *Id.* at (3)(B). There are appropriate penalties for breaches of this enforced silence. *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 220 (5 Cir.1980); *United States v. Lawson*, 502 F.Supp. 158, 167 (D.Md.1980). While it is true that disclosure of grand jury records has been authorized for use in private litigation, *see Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 220 (1979), district courts will be sensitive to possible foreign

incrimination in their decisions whether to allow disclosure under court order. Moreover, it is not clear whether Fed.R.Crim.P. 6(e)(3)(C)(i)—which governs disclosure for the purpose of judicial proceedings—applies to judicial proceedings outside the United States.

Obviously there always is the possibility of a leak, but "[i]f we carry out our professed intent to see that the Rule is enforced ... the likelihood is that the tradition of grand jury secrecy, which is 'older than the Nation itself' ... will not be cavalierly disregarded." *United States v. Flanagan, supra* note 2, at 125 (Van Graafeiland, J., concurring) (citations omitted). Moreover, we have the assurances of the government that precautions regularly are taken to prevent unauthorized disclosures. Other federal courts of appeals have found this guarantee of secrecy sufficient in itself to defeat similar claims of privilege based on the risk of foreign prosecution.[11] Even if these measures are not sufficient to eliminate all risk of leaks, they nevertheless make it far less likely that Gilboe's grand jury testimony ultimately would have triggered foreign prosecution.

When combined with the length of his sentence, the non-existence of any current or planned prosecution by other countries, and the overwhelming independent evidence of Gilboe's guilt in the shipping frauds, the small risk of a leak indicates to us that his fear of foreign prosecution was at best speculative and remote.

Since Gilboe did not have a real and substantial fear of foreign prosecution, his refusal to answer was not privileged under the Fifth Amendment. He was properly held in contempt of court.

We emphasize that the question of whether the Fifth Amendment privilege against self-incrimination may *ever* be invoked on the ground of potential foreign prosecution is not before us in the instant case. We leave that for another day.

Affirmed.

---

11. *E.g., In re Baird*, 668 F.2d 432, 434 (8 Cir.), *cert. denied*, 102 S.Ct. 2255 (1982); *United States v. Brummitt*, 665 F.2d 521, 524 (5 Cir. 1981), *cert. denied*, 102 S.Ct. 2244 (1982); *In re*

*Campbell*, 628 F.2d 1260, 1262 (9 Cir.1980); *In re Tierney*, 465 F.2d 806, 811 (5 Cir.1972), *cert. denied*, 410 U.S. 914 (1973).