**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**(UNDER SEAL), Defendants-Appellants.**

No. 86–5572.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1986.

Decided June 18, 1986.

Opinion Issued June 23, 1986.

John M. Bray (Cary M. Feldman, Douglas C. McAllister, Schwalb, Donnenfeld, Bray & Silbert, Washington, D.C., on brief), for defendants-appellants.

Theodore Stewart Greenberg, Asst. U.S. Atty., Alexandria, Va., and David B. Smith, Trial Atty., Washington, D.C., (Justin W. Williams, U.S. Atty., Alexandria, Va., on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Petitioners appeal from an order holding them in contempt for refusing to testify and to respond to a subpoena *duces tecum* before a grand jury, following a statutory grant of use and derivative use immunity. They contend that the Fifth Amendment affords them the privilege not to testify in the United States, because their testimony could be used to incriminate them in a pending prosecution in the Philippines.

The district court denied petitioners' motion to quash their subpoenas on the basis of the Fifth Amendment, granting instead the government's motion that petitioners be shielded from prosecution in this country by use and derivative use immunity. When petitioners persisted in their refusal to comply with the subpoena, the district court adjudged them in contempt and sentenced them to a period of incarceration to end either when they purged themselves of their contempt or when the term of the grand jury expired. In addition, the court entered a restrictive order with respect to the safekeeping and use of transcripts, records and notes of testimony they might give in response to the subpoenas. Finally, the district court stayed the beginning of sentence for thirty days on condition that petitioners not leave or travel outside the United States.

We affirm.

## I.

A grand jury in the Eastern District of Virginia was investigating possible corruption in arms contracts with the Philippines when petitioners, Irene Araneta and her husband Gregorio Araneta, III, respectively the daughter and son-in-law of Ferdinand E. Marcos, former President of the Philippines, came to the United States aboard an aircraft of the United States Air

**922**

Force.[1] After their arrival in the United States, the Solicitor General of the Philippines filed criminal charges against the Aranetas alleging the crimes of conspiracy and violations of the Anti-Graft and Corrupt Practices Act and Articles 210–221 of the Philippines Penal Code during the period 1966 until their departure on February 26, 1986. Approximately two months after their entry into the United States, the Aranetas, having been served with the grand jury subpoenas, appeared before the district court in connection with their motion to quash and the government's motion, pursuant to 18 U.S.C. §§ 6002 and 6003, to immunize them. The district court denied their motion, granted the government's motion and ordered them to testify. When they advised the court that they would persist in asserting the Fifth Amendment privilege and refusing to testify, the district court entered the order finding them in contempt, imposing punishment and protecting their testimony when and if given. The order was entered May 20, 1986.

The United States and the Republic of the Philippines have negotiated and entered into an extradition treaty, dated November 27, 1981. The treaty has not, however, received Senate ratification. By its terms, the treaty applies to certain offenses "committed before as well as after the date this Treaty enters into force." An affidavit of the United States Under Secretary of State for Political Affairs, who is responsible for, *inter alia,* formulating and executing United States foreign policy regarding the Republic of the Philippines, indicates the extreme importance the United States attaches to favorable relations with the Philippines and declares that it is the policy of the United States to strengthen and broaden those relations. Further, the affidavit shows that the United States has, at the request of the government headed by President Corazon Aquino, agreed to supply the government of the Philippines with an inventory and copies of documents held by U.S. Customs officials, obtained from President Marcos and members of his party when they arrived in Honolulu, Hawaii on February 26, 1986. The United States undertakes this obligation in order to assist the Philippine government in determining whether valuables and documents brought to the United States by former President Marcos were taken unlawfully and places a high priority on fulfilling this commitment. Finally, the affidavit recites that the Aquino government has established a presidential commission to seek recovery of property and assets claimed by the Republic of the Philippines and that the affiant "strongly believe[s] that it is in the foreign policy interests of the U.S. government to honor the Philippine Government's request [to assist the chairman of the commission in securing access to the documents being held by Customs] and our commitment to fulfill it at the earliest possible time."

After argument of this appeal, one of the lawyers in this case supplied us with a newspaper account reporting that on June 11, 1986, one week after the argument of this case, the United States and the Philippines entered into an agreement on procedures for mutual legal assistance. The accord commits the two signatories to share evidence in the legal investigations of specific corporations and individuals alleged to have provided kickbacks to obtain military and public works contracts, including a $2.1 billion nuclear power plant project. The two governments have also agreed to assist each other in arranging interviews with potential witnesses and locating additional evidence.

Petitioners and other members of the Marcos party are lawfully present in the United States under advanced parole status pursuant to 8 U.S.C. § 1182(d)(5).[2] In es-

---

**1.** In a case of this nature we would ordinarily not disclose the identity of the grand jury which had issued subpoenas or the identity of the persons contesting them. We do so here both because this information is already in the public domain purportedly as a result of disclosure by Mrs. Marcos and because the facts raising the unique legal issue would make identification an easy matter. It is also for these reasons that we did not hear argument *in camera.*

**2.** (5)(A) The Attorney General may, except as provided in subparagraph (B), in his discretion

sence, they are present, but not admitted, and may be returned to the Philippines in the discretion of the Attorney General when he determines that their presence no longer serves the public interest.

## II.

The Aranetas were granted statutory use and derivative use immunity pursuant to 18 U.S.C. §§ 6002 and 6003, and they concede that this satisfactorily replaces their Fifth Amendment privilege against self-incrimination under the laws of the United States. *See Zicarelli v. Investigation Commission,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Ullman v. United States,* 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). Instead, they argue that their right not to incriminate themselves has extra-territorial effect, i.e., that they have a right to refuse to testify in the United States if their testimony could be used to incriminate them under the laws of a foreign jurisdiction, here the laws of the Republic of the Philippines.

■ No authority controls our resolution of this issue, but *Zicarelli v. Investigation Commission,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972) provides the framework for our inquiry.[3] *Zicarelli* teaches that a court should first determine that the witness confronts a "real and substantial"

risk of foreign prosecution before proceeding to consider whether that witness, if fully immunized under domestic law, may assert a Fifth Amendment privilege on that basis. Accordingly, we first address the degree of danger that the Aranetas will be prosecuted in the Philippines.

While we cannot say with absolute certainty that the Aranetas will face foreign prosecution, we must proceed to the constitutional question if petitioners demonstrate a real and substantial danger of prosecution abroad. Here, petitioners have shown an objectively reasonable expectation of prosecution in the Philippines.

Our conclusion draws support from a method of analysis developed by the Second Circuit, which has addressed this question on several recent occasions. *In re Grand Jury Proceedings,* 748 F.2d 100, 103 (2 Cir.1984); *In re Gilboe,* 699 F.2d 71, 75 (2 Cir.1983); *In re Grand Jury Subpoena of Flanagan,* 691 F.2d 116, 121 (2 Cir. 1982). The *Flanagan* court assembled a series of factors to determine whether a witness faces a cognizable danger of prosecution:

> Whether there is an existing or potential foreign prosecution of him; what foreign charges could be filed against him; whether prosecution of them would be initiated or furthered by his testimony; whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and

parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the

alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

3. In *Zicarelli,* the Supreme Court granted *certiorari* to determine whether the Fifth Amendment precludes the compulsion of testimony that could be used to incriminate the witness in the courts of another country. 401 U.S. 933, 91 S.Ct. 916, 28 L.Ed.2d 213 (1971). The Court ultimately found it unnecessary to decide the issue because Zicarelli failed to establish "a real and substantial fear of foreign prosecution." 406 U.S. at 478, 92 S.Ct. at 1675. Because the witness could clearly have confined his testimony to areas of interest to domestic law enforcement officials, his fear of foreign prosecution was at best "remote and speculative," obviating the need for any Fifth Amendment protection.

whether there is a likelihood that his testimony given here would be disclosed to the foreign government.

691 F.2d at 121. Assessing these factors, we are persuaded that petitioners' fear of prosecution is real and substantial, rather than speculative and remote.

We begin by noting that the government of the Philippines has begun a prosecution against the Aranetas on charges congruent with the subjects comprising the grand jury investigation. Petitioners can reasonably expect to be interrogated on these subjects before the grand jury, raising the very real possibility that petitioners' testimony, or the fruits thereof, would prove useful in the pending prosecution. The government does not dispute this.

Essentially, the likelihood of foreign prosecution really depends on the likelihood that the Aranetas will find themselves under the jurisdiction of the Philippine government either voluntarily or otherwise. In their brief, the Aranetas suggest the possibility that they "may voluntarily choose to return to their country at a future date." Even though they may not return voluntarily, it is not remote or speculative that they may be returned involuntarily. Although the United States is not presently bound by an extradition treaty, such a treaty has been negotiated and signed, subject only to Senate ratification. While the record does not show whether the treaty has been submitted to the Senate, or whether the Senate has simply failed to act, the record clearly reflects the policy of our government to aid and assist the Aquino government in its pursuit of Philippine interests with respect to the Marcos regime. Given this unequivocal commitment, we do not deem either remote or speculative the possibility that, should the Aquino government request the return of the Aranetas and others, the treaty will be ratified, and a request for extradition will be honored.

Even short of ratification of the extradition treaty, the possibility that the Aranetas may be returned to the Philippines is neither remote nor speculative for an additional reason. Petitioners' continued presence in the United States depends wholly on the discretionary authority of the Attorney General. That discretion may be exercised at any time to revoke their right to be present. If revoked, the Aranetas may seek political asylum, and if that is denied, judicial review of the denial. But they would bear a heavy burden in seeking to overturn such denial, and although they might be successful in delaying exclusion, we cannot assume that they would easily prevail on the merits. Again because of the demonstration in the record of the present policy of the United States to aid and assist the present government of the Philippines, we think that there is a substantial likelihood that, if requested by the Aquino government, the Attorney General would revoke the permission of the Aranetas to be present in the United States, and it is not likely that they would be granted political asylum. If that permission to remain in the United States is revoked, there is no question but that the Philippines is the only place to which they may be sent.

■ Finally, we must determine whether the protective order entered by the district court so reduces the possibility of disclosure as to render inconsequential the risk that the Aranetas' grand jury testimony will be used against them in the Philippines.

The district court, in ordering the Aranetas to testify under a grant of immunity, included provisions pursuant to Fed.R. Crim.P. 6(e) to limit disclosure of any testimony given by them. The order seals the notes and records of petitioners' testimony and provides that no part shall be released except upon court order, the petition therefor to specify to whom it is to be released and the reasons for the release. Access to the testimony is limited to eight federal prosecutorial officials; those persons, and any person receiving any part of the testimony, are ordered not to divulge any portion to any other person or any foreign government. In addition, the government must maintain a record of the release of any information under court order, specify-

ing to whom the release is made, the date of release and the date of return. Finally, the order provides that any application for release and the record of any hearing thereon be under seal, and it warns that any violation of the order may be punished as a contempt of court.

The government argues that this order obviates the Aranetas' concern that their immunized testimony might be used against them in a prosecution by the Philippine government, thus precluding the assertion of a Fifth Amendment privilege. The government concedes, however, that it wishes to preserve the option of seeking a court order permitting disclosure to the Philippine authorities, should it be in the interest of the United States to do so.

While some authority holds that a Rule 6(e) order may adequately protect against the likelihood of disclosure of grand jury testimony to a foreign government, *see, e.g., In re Nigro,* 705 F.2d 1224, 1227 (10 Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983); *In re Baird,* 668 F.2d 432 (8 Cir.1982); *In re Tierney,* 465 F.2d 806 (5 Cir.1972), the facts of this case prove the contrary authority to be more compelling. The allegations against the Marcos family and the strategic importance of American relations with the Philippines have excited an unusual degree of public interest. This is not a simple case charging a garden variety of criminal conduct. Rather, this case involves a former head of state, whose alleged illicit gains are measurable only by the billions of dollars.

We do not suggest that a government official would knowingly violate the order of the district court, but we will not blind ourselves to the tensions that the case has generated which may give rise to an inadvertent disclosure. Moreover, the order protects only against the disclosure of *testimony;* it does not prohibit the United States from revealing evidence *derived* from the testimony at issue. *Cf. Kastigar, supra.* Certainly the order does not and cannot provide any mechanism to detect a disclosure no matter how inadvertent, and if a disclosure is made, the courts of the United States are powerless to restore secrecy once it is lost. The order also contemplates permitting disclosure at a future date, and we can conceive that court-permitted disclosure may be proper in a number of circumstances. Finally, should the Aranetas testify before the grand jury, and should the grand jury return an indictment, the Aranetas could be called as witnesses at the ensuing trial.

All of these reasons lead us to conclude that the Rule 6(e) order is not adequate to ensure that the testimony of the Aranetas will not be disclosed to the Philippine government. We therefore align ourselves with those courts that have ruled that such an order is not conclusive with respect to possible disclosure. *See In re Grand Jury Proceedings,* 748 F.2d 100, 103–04 (2 Cir. 1984); *In re Flanagan,* 691 F.2d 116, 123–24 (2 Cir.1982); *In re Federal Grand Jury Witness,* 597 F.2d 1166, 1168–69 (9 Cir. 1979) (Hufstedler, J., concurring); *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972). We conclude that the Rule 6(e) order cannot reduce the risk of self-incrimination adequately to obviate the necessity of our determining the reach of the Fifth Amendment.

In sum, we are persuaded that the risk of actual prosecution in the Philippines is sufficiently great that we should address the constitutional issue.

### III.

■ By its terms, the Fifth Amendment[4] does not purport to have effect in foreign countries; and ordinarily, unless specifically stated otherwise, a provision of domestic law, statutory or constitutional, is deemed to apply only to the jurisdiction which enacts it. Thus it seems quite certain that the Fifth Amendment would not prohibit the use of compelled self-incriminatory evidence in a Philippine prosecution if Philippine law countenanced its use. *See Rosado v. Civiletti,* 621 F.2d 1179, 1189 (2

---

4. No person ... shall be compelled in any criminal case to be a witness against himself ...

Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980).

To determine whether the Fifth Amendment protects from compelled self-incrimination a witness immunized under domestic law but exposed to a substantial risk of foreign prosecution, we reason by analogy to the extension of the Fifth Amendment to prosecutions under state law. When the Fifth Amendment was applied only to the federal government, the Supreme Court held that the protection it afforded did not forbid the United States from compelling testimony from a witness that would incriminate him under state law, *United States v. Murdock,* 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), nor did it forbid a state government from compelling testimony that would incriminate under federal law, *Knapp v. Schweitzer,* 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958). Only when the Fifth Amendment was held applicable to the states, *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), was the privilege held to protect a witness in state or federal court from incriminating himself under either federal or state law. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

■ From this history, we conclude that the Fifth Amendment privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment from compelling self-incrimination. *See,* Note, The Reach Of The Fifth Amendment Privilege When Domestically Compelled Testimony May Be Used in A Foreign Country's Court, 69 Va.L.Rev. 875 (1983). Since the Fifth Amendment would not prohibit the use of compelled incriminating testimony in a Philippine court, it affords an immunized witness no privilege not to testify before a federal grand jury on the ground that his testimony will incriminate him under Philippine law.

The privilege against compulsory self-incrimination serves a dual purpose. It protects individual dignity and conscience, and it preserves the accusatorial nature of our system of criminal justice. In *Murphy, supra,* the Court enumerated the values and aspirations underlying the Fifth Amendment:

> our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load."

378 U.S. at 55, 84 S.Ct. at 1596 (citations omitted). Our decision that the Aranetas cannot find shelter in the Fifth Amendment does not imperil these values. Insofar as the privilege exists to promote the criminal justice system established by our Constitution, it can have no application to a prosecution by a foreign sovereign not similarly constrained. Comity among nations dictates that the United States not intrude into the law enforcement activities of other countries conducted abroad. With regard to insulating the individual from the moral hazards of self-incrimination, perjury or contempt, the United States has done everything in its power to relieve the pressure by granting the Aranetas use and derivative use immunity. Just as comity among nations requires the United States to respect the law enforcement processes of other nations, our own national sovereignty would be compromised if our system of criminal justice were made to depend on the actions of foreign government beyond our control. It would be intolerable to require the United States to forego evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country. Our conclusion in this respect is reinforced by the authorities that hold, as a matter of domestic law, that the

Fifth Amendment privilege does not protect the witness against *all* adverse uses of his compelled testimony but only those adverse uses specifically proscribed by the Fifth Amendment. *See Piemonte v. United States,* 367 U.S. 556, 559–61, 81 S.Ct. 1720, 1722–23, 6 L.Ed.2d 1028 (1961); *Brown v. Walker,* 161 U.S. 591, 597–98, 605–06, 16 S.Ct. 644, 647, 650, 40 L.Ed. 819 (1896); *Ryan v. C.I.R.,* 568 F.2d 531, 541–42 (7 Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); *In re Daley,* 549 F.2d 469 (7 Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *Childs v. McCord,* 420 F.Supp. 428 (D.Md.1976), *aff'd,* 556 F.2d 1178 (4 Cir. 1977). Our conclusion also accords with the holdings in *In re Parker,* 411 F.2d 1067, 1070 (10 Cir.1969), *vacated as moot,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970); and *Phoenix Assurance Co. of Canada v. Runck,* 317 N.W.2d 402 (N.D.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982).

We reject petitioners' contention that *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) provides authority for us to hold that the Fifth Amendment does protect against self-incrimination under foreign law.[5] In *Murphy,* the Supreme Court first held that the Fifth Amendment protects a witness against self-incrimination under state and federal law if either jurisdiction compels his testimony. In arriving at this result, Mr. Justice Goldberg discussed English law dealing with the subject, concluding that English law provides protection against self-incrimination under foreign law. The Court's scholarship with respect to English law in this regard has been attacked, *see* Note, 69 Va.L.Rev. at 893–94, and the present English rule *not* to recognize such

protection was enacted by Parliament in the Civil Evidence Act of 1968. We do not enter the dispute as to whether *Murphy* represents a correct statement of the English rule at a particular time because we do not think that the *Murphy* holding depended upon the correctness of the Court's understanding of the state of English law and reliance thereon as the sole basis for decision. Rather, *Murphy* proceeds as a logical consequence to the holding in *Malloy v. Hogan, supra,* that the Fifth Amendment privilege against self-incrimination is fully applicable to the states. *Zicarelli* shows that the English rule, even if it in fact protected against self-incrimination in a foreign jurisdiction was not the basis of decision in *Murphy. Zicarelli* was decided on the ground that the witness had not shown that he was in real danger of being compelled to disclose information that might incriminate him under foreign law. Significantly, the Court added:

> Should the Commission inquire into matters that might incriminate him under foreign law and pose a substantial risk of foreign prosecution, and should such inquiry be sustained over a relevancy objection, then a constitutional question will be squarely presented. We do not believe that the record in this case presents such a question.

406 U.S. at 481, 92 S.Ct. at 1676 (footnote omitted) We understand this language to indicate that, as far as the Supreme Court is concerned, the question before us remains an open one. Had it been decided in *Murphy* that the privilege extended to foreign prosecutions, the quoted language in *Zicarelli* would have been unnecessary and *Zicarelli* could have been more simply decided on the settled principle that the privi-

---

**5.** Some courts have adopted this thesis. *Mishima v. United States,* 507 F.Supp. 131 (D.Alaska 1981); *United States v. Trucis,* 89 F.R.D. 671 (E.D.Pa.1981); *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972). The Aranetas also argue that the several decisions, including *Zicarelli v. Investigation Commission, supra,* holding that a witness failed to demonstrate a real and substantial danger of foreign prosecution have as their underlying premise that the privilege

would apply if a real and substantial danger of foreign prosecution were established. We cannot read those cases in that manner. We think they proceed only with healthy regard for the principle that constitutional issues not be decided unnecessarily. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

lege extended to testimony that could incriminate the witness under foreign law.

Fully mindful of our obligation to decide only the case before us, we nevertheless feel compelled to note what is not at issue in this case. First, there has been no attempt to show that the United States inspired, instigated or controls the Philippine prosecution. *See United States v. Emery,* 591 F.2d 1266, 1267–68 (9 Cir.1978) (suppressing inculpatory statements made while defendant was in custody of Mexican authorities, where American DEA agents participated by alerting their Mexican counterparts of defendant's wrongdoing, coordinating surveillance, supplying personnel and giving signal triggering arrest); *cf. Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949) (suppressing evidence produced by joint venture of federal and local officers prior to incorporation of Fourth Amendment); *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927) (suppressing evidence obtained by federal prohibition agent while assisting local police in search authorized by warrant insufficient under federal constitutional law); *United States v. Hensel,* 699 F.2d 18 (1 Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983) (evidence seized by foreign authorities excluded if (a) circumstances surrounding search and seizure shock judicial conscience; (b) American officials participated in search; or (c) foreign authorities conducting search acted as agents for their American counterparts); *United States v. Rose,* 570 F.2d 1358 (9 Cir.1978) (same); *United States v. Morrow,* 537 F.2d 120 (5 Cir.1976) (same); *Stonehill v. United States,* 405 F.2d 738 (9 Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969) (same). In addition, petitioners have not suggested that the United States, in compelling their testimony under a grant of immunity, pursues no legitimate purpose of its own, even if it also has an intention to assist a foreign government whose continued good will is of great strategic importance. In short, petitioners have not presented to us a claim of American participation in a foreign prosecution, either actually, through a joint venture with foreign law enforcement officials, or constructively, by means of employing such individuals as agents. The case before us does not require us to address either of these factual patterns, as we express no views on them at this time.

AFFIRMED.[6]

---

6. Because the government has not appealed, we have no occasion to consider whether the district court's protective order should be modified in the light of the views that we have expressed. Our affirmance is without prejudice, however, to the right of either party to seek modification from the district court and without limitation on the district court's discretionary authority to modify for what it deems good cause shown.