**UNITED STATES of America, Plaintiff,**

v.

**Donald BROWN, et al., Defendants.**

**No. CR–2–90–243.**

United States District Court,
S.D. Ohio, E.D.

Feb. 27, 1991.

---

Robyn Jones, Asst. U.S. Atty., for U.S.

Joseph Hans and Ray Grove, Columbus, Ohio, for D. Brown.

Fred Thomas, Columbus, Ohio, for Tanya M. Powell.

Richard Cline, Columbus, Ohio, for Florencia Walker.

David Bodicker, Columbus, Ohio, for Delia Butler.

George Luther, Columbus, Ohio, for Brenda Givens.

Karl Schneider, Columbus, Ohio, for Joyce Crawford.

Steve Nolder, Columbus, Ohio, for Halima Isa.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court pursuant the joint motion for a protective order filed on behalf of Witnesses Brenda Givens ("Givens"), Joyce Crawford ("Crawford"), and Halima Isa ("Isa", aka Linda Oluku). The Court will address the motion herein.

By way of background, Defendants Donald Brown ("Brown"), Tanya Powell ("Powell"), Florencia Walker ("Walker") and Delia Butler ("Butler"), coupled with Oluwole A. Ogungbuyi and Abeni O. Ogungbuyi, two current fugitives, were charged in a thirty-four (34) count indictment with, *inter alia*, conspiracy to import over one kilogram of heroin, importing heroin, and engaging in a continuing criminal enterprise. The Government is in need of the testimony of three women who allegedly acted in concert with the charged defendants. These women, Givens, Crawford and Isa are currently incarcerated in Japan for their involvement in the same heroin smuggling conspiracy charged in the instant indictment.

The week of November 12, 1990, Government Counsel, Defense Counsel and Defendant Donald Brown travelled to Tokyo, Japan to take the depositions of the three women. Prior to the commencement of the depositions, defense counsel and government counsel were given the opportunity to interview the women in preparation for the depositions. Following the interviews with defense counsel, the three women expressed a desire to be represented by counsel prior to testifying. The Court was advised of the situation and on November 13, 1990, the Court appointed an individual attorney to represent the interest of each of the witnesses. The Court further scheduled times in which the defendant would be able to converse over the telephone with their appointed counsel. These conversations were held, however, the witnesses

and their attorneys were reluctant to have them testify due to the attorneys' fears of self incrimination as it would apply to jurisdictions outside the United States and presumably outside the province of the Justice Department's ability to grant immunity (e.g. Thailand). It was the Court's position that the witnesses reluctance to testify eliminated any and all reasons for the parties to remain in Tokyo, Japan, and they were therefore ordered to return to the United States.

The Court will now turn its attention to the joint motion filed on behalf of the Witnesses Givens, Crawford and Isa.

*Joint Motion for Protective Order*

Counsel on behalf of Witnesses Brenda Givens, Joyce Crawford and Halima Isa have filed a joint motion wherein they request that the Court issue a protective order that effectively would seal the courtroom during the trial while their clients' videotaped testimony was being shown to the jury. For the reasons stated herein, the Witnesses' joint motion is GRANTED IN PART and DENIED IN PART.

In the Supreme Court case of *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (*citing, e.g.*, M. Hale, The History of the Common Law in England 343–345 (6th ed. 1820); and 3 W. Blackstone, Commentaries 372–373), the Court noted that the historical evidence of the evolution of the criminal trial in Anglo–American justice demonstrates conclusively that at the time the United States' organic laws were adopted, criminal trials both here and in England had long been presumptively open, thus assuring the public that the trials were conducted fairly, discouraging perjury by those testifying, limiting misconduct by participants, and eliminating any appearance of judicial decision based upon secret bias or partiality. In sum, the purpose of providing open trial to criminal defendants is to "satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).[1]

Clearly there has been an unbroken history, "supported by reasons as valid today as in centuries past", *Richmond Newspapers, Inc.*, 448 U.S. at 573, 100 S.Ct. at 2825, of openness in the execution of justice in this country. The Supreme Court noted that although a direct holding on that issue had not previously existed, the conclusion is hardly novel given the numerous prior decisions wherein just such a conclusion was explicitly stated and implicitly denoted. *See, e.g., Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) (Court stated, "Of course trials must be public and the public have a deep interest in trials."); and *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947) (Court provided, "A trial is a public event. What transpires in the court room is public property").

Ultimately, the Supreme Court concluded that the right of the public and the press to attend criminal trials is guaranteed under the First and Fourteenth Amendments.

---

**1.** For an excellent in-depth analysis of the evolution of public trials from the days of the Norman Conquest through the Continental Congress and up to and including modern criminal trial, refer to *Richmond Newspapers, Inc.*, 448 U.S. at 564–573, 100 S.Ct. at 2820–2825.

In the Supreme Court's opinion, it notes that throughout history criminal trials have been open to the public and attendance has been encouraged, if not at times required. The Court cites as an example an address to the inhabitants of Quebec which was approved by the First Continental Congress on October 26, 1774. 1 Journals of the Continental Congress, 1774–1789, pp. 101, 105 (1904) (Journals). The opinion reveals that the address was written to explain the position of the Colonies and to gain the support of the people of Quebec. Because the people of Quebec had been "educated under another form of government" the address took the opportunity to explain "the inestimable advantages of a free English constitution of government, which it is the privilege of all English subjects to enjoy." The address provided as follows:

"[O]ne great right is that of trial by jury. This provides, that neither life, liberty nor property, can be taken from the possessor, until twelve of his unexceptionable countrymen and peers of his vicinage, who from that neighborhood may reasonably be supposed to be acquainted with his character, and the character of the witnesses, upon a fair trial, and full inquiry, face to face, *in open Court, before as many of the people as chuse to attend,* shall pass their sentence upon oath against him...." *Id.*, at 107 (emphasis added).

Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.[2] *Richmond Newspapers, Inc.,* 448 U.S. at 580, 100 S.Ct. at 2829. The conclusion was reached by the Court by focusing on the press and public's rights under the First and the Fourteenth Amendments to attend such a trial. The Court noted that the First Amendment, in conjunction with the Fourteenth Amendment, prohibits governments from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *Id.,* at 575, 100 S.Ct. at 2826. The Court further advised that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Id.,* at 575–576, 100 S.Ct. at 2826–2827 (citing *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978). Essentially, the Court took the position that a freedom to listen exists and that freedom includes a right to "receive information and ideas." *Kleindienst v. Mandel,* 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972). "What this means in the context of trials is that the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted." *Richmond Newspapers, Inc.,* 448 U.S. at 576, 100 S.Ct. at 2827.

This Court is of the opinion that there exist several rights and interests that affect a variety of concerned parties to the trial process, not the least of which is the public and the press' right to attend, observe and report through the media to the general public that justice was in fact being performed. With that in mind, the court does not lightly approach a request to clear the courtroom and bar the doors. Furthermore, this Court is of the belief that less restrictive measures exist whereby the Court can ensure that the testifying witnesses can be afforded sufficient safeguards to prevent the mass dissemination of their client's testimony.

■ Counsel for the witnesses make a variety of requests concerning the issuance of a protective order, several of which the Court believes would be reasonable and would avoid doing harm to the rights of all parties concerned. The Court further recognizes and will address *infra* the additional Fifth Amendment concerns the witnesses have expressed and their ramifications on the motion for protective order. Therefore, the Court IN PART GRANTS THE MOTION and HEREBY ORDERS AS FOLLOWS:

1. After the testimony is given by the witnesses in Japan the record, notes and any transcription is to be immediately sealed. Only the defendants, counsel for the defendants, the above-referenced witnesses, counsel for the witnesses, and Assistant United States Attorneys are to receive copies of the transcription of testimony.

2. No part of the testimony, notes from the deposition, record of the deposition or any other part of the deposition or record of deposition is to be disclosed or released by any party to third-persons without Order of the Court.

3. Any request for release of the testimony or record of testimony is to be sealed and filed with the Court.

4. Any violation of the protective order will be punished as contempt of court.

As to the witnesses' counsel's specific request to seal the courtroom, that part of the motion is hereby DENIED. As will be noted below, the Court's decision here is at least in part based upon the Court's opinion

---

2. It should be noted that in *Richmond Newspapers, Inc.,* it was the defendant who moved to have the courtroom cleared of all spectators, therefore, the Court did not need to address the Sixth Amendment's guarantee that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and *public trial,* by an impartial jury ..." U.S. Const. Amend. VI. Instead the Court focused on the newspaper's right to be present at a criminal trial. It was noted that the Constitution does not explicitly provide for such a right.

as it relates to the witness' Fifth Amendment right.

Related to the Court's above ruling, counsel for the witnesses, in their joint motion, argue that the Court should be guided in the above stated protective order by the five factor test set forth in *United States v. Flanagan*, 691 F.2d 116 (2nd Cir. 1982), however, this is a test for determining whether a Fifth Amendment claim may be asserted as to a fear of foreign prosecution.[3] *Flanagan* offers nothing to support the issue of barring the public or the press from the trial and fails to address the ramifications of such an action as it would relate to the First and Fourteenth Amendments. Instead, *Flanagan* is strictly interested in the issue of when a witness may properly exercise a Fifth Amendment right based upon a fear of prosecution in a foreign country. Nonetheless, *Flanagan* does express, as part of the five factors to be considered, that if the Court limits the likelihood that the witnesses' testimony would be disclosed to foreign governments the witnesses effectively lose their ability to exercise their Fifth Amendment right against self incrimination.[4]

■ In applying *Flanagan* to the instant case, this Court is of opinion that the witnesses have failed to sufficiently show the threshold for invocation of the Fifth Amendment on grounds of witness' fear of prosecution in a foreign country. The threshold showing the witnesses must make to exercise the right is real and substantial risk of prosecution in a foreign country since the Fifth Amendment protects against real dangers, not remote and speculative possibilities. *In re Gilboe*, 699 F.2d 71 (2nd Cir.1983). In *Gilboe* the Court noted that "[b]efore the Fifth Amendment issue is reached, however, we have required the witness asserting the privilege to demonstrate 'a real and substantial risk, as distinguished from a mere possibility, that answers to questions might provide a link which would lead to incrimination of him and be used in a foreign prosecution of him.'" *In re Gilboe*, at 75, (citing *United States v. Flanagan, supra;* and *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 702, 19 L.Ed.2d 889 (1968)). *Flanagan* has provided that "[t]he apprehension must be a real and reasonable one, based on objective facts as distinguished from [the witness'] subjective speculation", and there must be "a particularized showing that the testimony may incriminate the witness in the foreign prosecution." *Id.*, at 121.

In reviewing the instant case, the witnesses have completely failed to make any showing whatsoever, let alone a "particularized showing", that any testimony given may incriminate the witness in the foreign prosecution. Instead, they have simply alleged incrimination. Furthermore, the alleged potential for foreign prosecution seems remote at best and cannot be characterized at this point as anything more than subjective speculation. No one has offered the Court a single instance or a shred of evidence to indicate that any of the indicated countries in which the testimony allegedly will incriminate the witnesses is pursuing or conducting any type of investigation. It appears to be the contention of

---

**3.** The five factors the Court is called upon to weigh in determining whether a witness may be permitted to exercise a Fifth Amendment claim based upon a fear of foreign prosecution is as follows:

"... the court in resolving the issue must then focus on such questions as [1] whether there is an existing or potential foreign prosecution of him; [2] what foreign charges could be filed against him; [3] whether prosecution of them would be initiated or furthered by his testimony; [4] whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and [5] whether there is a likelihood that his testi-

mony given here would be disclosed to the foreign government." (numbers in brackets added.)

Clearly, the witnesses' joint motion serves to address the fifth factor, that being the likelihood of disclosure.

**4.** The logic being that if dissemination of the alleged self incriminating testimony is controlled, by sealing the courtroom and barring the press and public, thereby preventing foreign jurisdictions from learning of the content of the testimony, the statements no longer serve to incriminate the witnesses. If no potential for incrimination exists, likewise, no Fifth Amendment right can be exercised.

the United States Attorney that no jurisdiction, foreign or otherwise, has been in contact with the government concerning an ongoing investigation. Therefore, based upon the above-referenced findings, the Court is of the opinion that the witnesses have failed to show that there is a real and substantial fear that prosecution by a foreign government might ensue and thus, a refusal to answer will not be privileged under the Fifth Amendment.[5] Such a finding relates directly to the Court's decision that closing the courtroom would not be necessary and less restrictive measures are available to at least limit the distribution of the witnesses' testimony, regardless of how remote the potential for prosecution in a foreign country may be.

### CONCLUSION

The motion for a protective order is hereby GRANTED IN PART and DENIED IN PART as explained above.

IT IS SO ORDERED.

---

**5.** It was based upon this Court's belief that the requisite burden to show a "real and substantial risk" could not be met that the Court further concluded that the strict control of the dissemination of the testimony at trial would not be necessary.